Rachel Yedlin and Another, Appellants, *v.* Harris Rubin and Another, Respondents, Impleaded with Cologero Napoli, Defendant.

Second Department, March 11, 1927.

**Vendor and purchaser — action to rescind purchase of real property on ground of fraud — finding that defendants did not commit fraud is contrary to evidence — plaintiffs not chargeable with laches since delay was caused by defendants' fraudulent representations.**

This is an action to rescind the purchase of certain premises by the plaintiffs from the defendants, to cancel the purchase-money bond and mortgage and to compel defendants to accept a reconveyance of the property. The basis of the action is fraud and misrepresentation on the part of the defendant vendors. The conclusion of the court below that there was not sufficient evidence to show that the plaintiffs were defrauded by the vendors is contrary to the clear weight of the evidence viewed in the light of the findings of fact by the court. The court found that one of the defendants stood in a relationship of confidence, esteem, respect and trust towards the plaintiffs and the facts clearly indicate that the defendants, standing in a fiduciary relationship towards the plaintiffs, falsely misrepresented the facts relating to the property and unjustly took advantage of their position and, therefore, the plaintiffs are entitled to succeed in this action.

The contention by the defendants that the plaintiffs should be charged with laches because they waited two months before they began this action is without merit, for it appears that the delay was caused by the fraudulent representations on the part of the defendants that the tenants would move into the building shortly after the close of the Jewish holidays, which was approximately one month after the title was closed.

Appeal by the plaintiffs, Rachel Yedlin and another, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Kings on the 11th day of March, 1926, upon the decision of the court rendered after a trial at the Kings Special Term in an action to rescind the purchase of certain premises by plaintiffs from defendants, to cancel a purchase-money bond and mortgage given by plaintiffs to defendants Rubin, and to compel defendants to accept a reconveyance of the property upon the ground of fraud.

*Gustave B. Garfield* [*Maurice V. Seligson* with him on the brief], for the appellants.

*Max L. Kane,* for the respondents.

Kelly, P. J. In this action, brought by the plaintiffs to rescind the purchase by them from defendants of certain real property in the Brownsville section of Brooklyn, to cancel a purchase-money bond and mortgage and to recover the cash paid by them upon the conveyance of the property upon the ground of fraud, we

are unable to agree with the conclusion of the learned trial justice that there was not sufficient evidence to show that the plaintiffs were defrauded by the defendants, upon which conclusion he based his judgment dismissing the complaint upon the merits. While it is true that the learned trial justice had the advantage of seeing and hearing the parties, plaintiffs and defendants, we think the judgment is contrary to the clear weight of the evidence viewed in the light of the findings made by the learned justice, that the defendant Charles Rubin, the father of the defendant Harris Rubin, occupied a fiduciary relation towards the plaintiff Tartakoff, " a relationship of confidence, esteem, respect and trust," and his further findings, that said plaintiff " was a widow, and that the sum of $2,500 which was required by her to purchase the foregoing premises were the proceeds of a policy of life insurance received by her on the demise of her former husband. That prior to the purchase and sale of the foregoing premises, the defendant Charles Rubin was acquainted with, and well knew the fact that the plaintiff, Yetta Tartakoff, was a widow, and had received the said sum of $2,500 as the proceeds of a policy of life insurance upon the demise of her husband." And in his opinion, delivered at the close of the trial, the learned justice said: " There is no question but what the plaintiff made a poor investment. This is one of those cases where a widow is left money without business experience and gets busy with a poor investment. She should not have invested in it and her brother-in-law should not have let her, and the defendants in this action certainly should have known that she could not have carried on the premises by taking it, but there is insufficient to constitute fraud. The court, therefore, finds that there is not sufficient evidence to constitute fraud, and the complaint is dismissed."

The uncontradicted evidence in the case shows that the plaintiff Yetta Tartakoff is a widow whose husband died in May, 1925, leaving her with two daughters, one nearly twenty, the other younger. Her husband's life was insured for $2,500, and as I read the evidence this was practically the only property she had outside of the ordinary household goods. She lived upon New Lots avenue with her daughters. The plaintiff Rachel Yedlin is the sister of Yetta Tartakoff. After her husband's death she kept the check for $2,500 insurance money, because, she says, she wanted to keep it for her children. She evidently supported herself by working, and the elder daughter (at least) also worked. She was afraid if she deposited the money in bank she would spend it. She wanted to invest it. I think it is very evident that she had no business experience and knew nothing of " investments." Her

sister, Mrs. Yedlin, was the wife of Abraham Yedlin, who lived next door to her on New Lots avenue. Mrs. Tartakoff applied to her brother-in-law for advice, she thought she ought to invest the money in "lots." Yedlin was in the jewelry business, and he was the vice-president of a synagogue in Brownsville. The defendant Charles Rubin was an official in the synagogue, he was the "gobay" or "Caretaker of the 'Holy Scroll,'" an office which the appellants' counsel says is one invested with much dignity and held by none but upright men. Because of his office he was regarded in the synagogue as a man of uprightness and character, and as the learned trial justice has found, the plaintiff Tartakoff respected him and trusted him. Yedlin spoke to Charles Rubin about his sister-in-law's desire to invest the $2,500 in lots, and, without going into the details, he brought them together. Rubin had attended the funeral of the deceased Mr. Tartakoff. He advised against investing the money in lots. Mrs. Tartakoff says: "So I said, 'Why?' So he said, like this: 'It is an ox, you always have to feed it, and he will never give you something back; and the house,' he said, 'always gives milk.'" At any rate, Mrs. Tartakoff, instead of investing her $2,500 in lots, was induced to invest it in a house owned by or title to which stood in the name of defendant Harris Rubin, son of the defendant Charles Rubin.

The details of the transaction are set forth at length in Mrs. Tartakoff's evidence, supported by her sister coplaintiff, and her brother-in-law Yedlin. The price asked for the property at the outset, $31,250, was reduced to $29,000 as a favor to Mrs. Tartakoff. The property consisted of a two-story building recently erected by defendant Harris Rubin. There was a first mortgage on the house. The price stated called for a payment of $6,000 cash. Mrs. Tartakoff called attention to the fact that she had but $2,500. "So I said: 'How much do I have to pay in this house?' He said, 'This house you got to pay in about $6,000.' So I says, 'Well, Mr. Rubin, I told you that I haven't got more than $2,500, my check from the insurance policy is only $2,500,' and so he said: 'I will tell you what I will do for you, Mrs. Tartakoff; nobody can come in this house less than for $6,000; for you — I know you well, and you know me, that I am a "gobay"'— a 'gobay' means a caretaker — 'and I am always there — you know I am not looking for business, and I am rich enough, and my sons — my sons own about $200,000, and I am not far from that, and I don't care for money, and I will make you less than $2,000 on the house; it wouldn't hurt me, and I know for you it will do a lot, and so I will do it for you, and I will try to give you as cheap the house as possible, and I will make you $2,000 cheaper than

somebody else, and I will make you that $4,000 payment.' So I said: ' I haven't got even $4,000; all I have is $2,500 ' and so then Mr. Yedlin was there present and he called Mrs. Yeldin off on the side and he told her something, I don't know what." She testified that Charles Rubin said to her: " ' See, this house brings in $400 a month, and you will have a good investment here, you will be sure with your money, you will have enough to pay off your mortgage, and you will cover all your expenses.' Q. Did you ask him about those stores and apartments? A. Just a minute, I will come to that. Wait, I didn't finish. And he said: ' You will have yet about $200 left over a year except all your expenses.' " Some of the stores and apartments were vacant, but Rubin told her not to worry, that they had actually been rented and that the tenants would move in shortly. He told her who the tenants were to whom he had rented the vacant space.

Her sister and coplaintiff was induced by Rubin to agree to put up the additional $1,500 needed to make the $4,000. When the closing hour came, Mrs. Yedlin could raise but $500, so that the total amount of cash paid was but $3,000. The amount of the purchase-money mortgage was increased $1,000, the two women agreeing to pay the $1,000 on October 10, 1925, viz., in one month, although Rubin knew that the only money Mrs. Tartakoff had was the $2,500 insurance money and that Mrs. Yedlin had borrowed the $500.

At the closing, a lawyer named Kaplan represented the two women. He was examined as a witness by the plaintiffs, although subpœnaed by defendants. He expressly disclaimed any responsibility for the " investment." He said he was hired simply to attend the closing and to see that the papers were in proper shape. He did not read the papers to the plaintiffs, but he " transposed them into Yiddish." At any rate, the respondents Rubin make much of the fact that the contract or closing statement recited the monthly rental to be but $159.31, and they say that the plaintiffs saw the property and that the vacant stores and apartments were open to view, and that there were " to let " signs on the house. But it is evident all through the evidence that these two women were relying entirely on Charles Rubin's assurances. They refused to take receipts from him for money paid. In my opinion, they relied on his statements, backed up by those of his " boy," Harris. There is no such thing as " contributory negligence " where a defendant is charged with *fraud.*

The two women took the title in August. The Rubins had stated that their tenants would move in after the Jewish holidays, which ended in the middle of September. When they did not

appear, Mrs. Yedlin went to the home of the Rubins to protest. She found Harris, who refused to talk to her on the ground that he was engaged in prayer; she waited an hour for him to complete his devotions; but he refused to take the property back. She appealed to his father, defendant Charles Rubin, "For God's sake take the house and have pity on my sister, you are rich people and my sister is poor," and the reply was, "If sold it is sold forever. Did you ever hear that a builder should take back a house after he sold it?" And when Rubin's attention was called to his statement that the house brought in $400 per month rent, and that all that was forthcoming was $150, his reply was: "I don't want to know a thing about it, once sold it is sold forever. * * * Business is business." There is no contradiction of this evidence.

Of course the crash came immediately. The $1,000 cash forbearance on the closing had been put in the purchase-money mortgage. It was due in one month. The women had no money. The time was extended for one month. The defendants at once set about assigning the purchase-money mortgage. They tried to get the women to sign an estoppel certificate, but they refused. The Rubins wanted to assign the mortgage to defendant Napoli. But in October, 1925, Napoli took the mortgage without any estoppel certificate; he began a foreclosure action. It is stated in appellants' points that the foreclosure action went to judgment, and the two plaintiffs lost everything.

After the catastrophe the plaintiffs brought the matter before the synagogue authorities through the witness Weinkrantz, a member of the congregation and apparently a disinterested witness. At the request of Mrs. Tartakoff he saw Charles Rubin, whom he had known for a long time. He told him of plaintiff's charges that he had "fooled her out of that money" and "it looked very bad for me and for you, that were members in a synagogue, that happen a thing like that. And he says, 'Business is business.' I told him: 'Mr. Rubin, you better make an arbitration. I will see and get the rabbi, and we should arbitrate it between friends.' He says: 'All right, I will be only too glad to do so,' and I made arrangements by the evening, and around eight people and the rabbi was there present, and the rabbi made out a paper that Mr. Rubin should sign that he should agree to that,— that if you arbitrate it, you should be satisfied. * * * He said he wouldn't sign; he will ask his son first, and so we adjourned it for the next evening for conference; and the next evening he let know the rabbi that he didn't want any conference any more — 'Business is business.' "

Mr. Rubin did not attempt to contradict this. The learned judge said it was not very material and that he would not pay

any attention to it in arriving at a decision, but he left it in the record. I am not so sure that, in an action based on fraud, it has not some significance.

There is no serious dispute about the law, which is cited with authorities in the points of both parties. I do not agree with respondents' point II to the effect that plaintiffs can be charged with laches, because they waited two months before they began the action. Plaintiffs explain the reason, which is found in Rubin's repeated assurances that the mythical " tenants " would move in after the holidays, and in their undoubted trust and reliance upon Rubin's position as a gobay in the synagogue. The court has found that the defendants should have known that Mrs. Tartakoff could not have carried on the premises after taking them. I think they did know, and that they have failed to explain the transaction or to satisfy the burden which the law puts upon fiduciaries who have ruined those who relied upon them.

In my opinion, the plaintiffs are entitled to judgment.

The judgments should be reversed upon the facts, with costs, and judgment directed for the plaintiffs for the relief demanded in the complaint, with costs. Findings contrary to this decision should be reversed, and new findings should be made in conformity therewith.

MANNING, YOUNG, LAZANSKY and HAGARTY, JJ., concur.

Judgments reversed upon the facts, with costs, and judgment directed for plaintiffs for the relief demanded in the complaint, with costs. Findings contrary to this decision reversed, and new findings to be made in conformity herewith. Settle order upon notice.