■ GAYLORDS NATIONAL CORPORATION, Respondent, v ARLEN REALTY & DEVELOPMENT CORP., Appellant.—Order, Supreme Court, New York County (Bruce McM. Wright, J.), entered June 20, 1984, granting plaintiff summary judgment confirming the rental terms contained in the lease and sublease agreements, unanimously affirmed, with costs.

Defendant's predecessor leased certain commercial premises on Government Blvd. in Mobile, Alabama, from Alice Mae Corporation in 1959. The lease was for 12 years, terminating at the end of February 1972, at an annual rental of $56,000, plus 1 1/4% of the tenant's gross sales that exceed $4,480,000 per year. The lease also contained, in paragraph 18, an option to renew for an additional 10-year term. Defendant (Arlen) exercised this option to renew, and in November 1971 the lease was formally modified to extend the term for an additional 10 years, through the last day of February 1982, at a basic rental of $66,500 per year, plus 1 1/4% of the tenant's gross sales that exceed $5,320,000 per year. This modification of the lease also included an option to renew for still another 10-year term, through February 1992. Were that option to be exercised, no later than March 1, 1981, the rent during that additional 10-year term was stated to be $77,000 per year, plus 1 1/4% of the tenant's gross sales that exceed $6,160,000 per year.

In 1973 defendant and plaintiff's subsidiary entered into a

sublease of the premises, for a term to expire on February 27, 1982, at an annual rental of $66,500 plus 1 1/2% of the subtenant's gross sales that exceed $3,500,000 per year. Under the terms of the sublease, the rent could be paid directly to the prime landlord, on the latter's consent. The sublease contained an option for a 10-year renewal, upon 13 months' notice prior to expiration of the sublease.

In 1982 both the prime tenant (Arlen) and the subtenant (Gaylords) exercised their options to renew their respective leases. Under the terms of the prime lease as modified, Arlen was thus obligated to an annual rental of $77,000 plus 1 1/4% of gross sales that might exceed $6,160,000, and Gaylords was obligated, under the terms of the sublease, to a continuing annual rental of $66,500 plus 1 1/2% of gross sales that might exceed $3,500,000 per year. As is readily apparent, on basic rent alone, defendant would sustain an annual shortfall of $10,500 ($875 per month) between its basic rental income on the sublease and its obligation on the prime lease. Arlen demanded that Gaylords pay this additional $875 per month to Alice Mae, notwithstanding the stated terms of the sublease. Gaylords thereupon brought this declaratory judgment action to enforce the terms of the sublease. When Gaylords moved for summary judgment, Arlen responded with what amounted to a counterclaim for reformation of the sublease, although no such claim has been asserted in its responsive pleading.

Arlen supports its argument for reformation on the ground that the unfavorable rental terms of the sublease (vis-à-vis the prime lease) were obviously the result of a mistake. Arlen asserts that a number of similar subleases were prepared for commercial properties around the country at about the same time because of its decision to terminate its retail discount department store business consisting of about 90 stores. In the rush to get them drafted, Arlen asserts certain boilerplate language was used in all of them, and that the shortfall in the instant case was thus overlooked. Three such subleases on other commercial properties in Alabama and Louisiana were submitted for proof comparison.

An examination of all four subleases plainly belies the claim of mistake. All were prepared in June 1973. Although there is a considerable amount of boilerplate language in each of them, it is abundantly clear that each of these subleases, while perhaps negotiated under "rush" conditions, was specifically tailored for each particular store. For example, with regard to the options to renew, the sublease before us con-

tained one 10-year option, upon 13 months' notice. Two others contained four 5-year options to renew, on 12 months' notice each. The fourth contained three 5-year options to renew, on 15 months' notice each. In each case the time for exercise of the option is longer than the time in the prime lease, for obvious reasons. In none of the four subleases is an escalation schedule set forth for the amount of rent to be fixed during such terms of renewal. An examination of the prime leases under which these subleases were granted indicates that they, as was the case with the premodified prime lease before us, also did not contain escalation schedules for rent during the renewal terms. Rather all of these leases and subleases indicated merely that options to renew would be on the same terms and conditions as set forth in the initial term.

However, in our case the 1971 modification of the prime lease set forth an escalated schedule of rent during the forthcoming term (1972-1982) and the future option term currently at issue before us (1982-1992). In the face of the differences among the leases and subleases, the claim of mistake is incredible.

Arlen's mistake, if indeed it was a mistake,* was in failing to include a rent escalation schedule in any of its subleases, either in specific monetary terms or in terms keyed to Arlen's rental obligations during renewal terms on the prime leases. Arlen's explanation of the circumstances that led to this alleged mistake is contradicted by its own documents. Defen-

---

* Note that while Arlen now finds itself in an unfavorable position with regard to basic rent, its position with regard to additional rent based on percentage of gross sales has become enhanced, by reason of the 1971 modification of the prime lease, with each succeeding renewal term. For example, since 1973 defendant has been entitled to 1 1/2% of plaintiff's gross sales exceeding $3,500,000 per year. Under the terms of the prime lease as modified, during the period 1972-1982, when basic rent on the sublease was the same as on the prime lease, defendant was obligated to Alice Mae for additional rent in the amount of 1 1/4% of gross sales exceeding $5,320,000; and in the current term (1982-1992) defendant's obligation for additional rent to Alice Mae has dropped to 1 1/4% of gross sales exceeding $6,160,000. While we are not privy to the gross sales figures for this commercial property, simple arithmetic will demonstrate that annual gross sales by the subtenant in excess of $4,200,000 (i.e., $700,000 over the threshold) will make up defendant's $10,500 shortfall. Even were gross sales to be high enough to trigger the additional rent clause in the prime lease, defendant's income from the sublease would always be well over $10,500 in excess of its obligation on the prime lease. This analysis would seem to contradict what might otherwise appear to be an anomalous circumstance of defendant's income on the sublease being less than its obligation on the prime lease.

dant states that it was managing all of these properties on a break-even basis, with the intention of disposing of the leasehold interests. If that were the case, then it is difficult to understand why defendant offered so many renewal options to its subtenants.

Without reaching the question whether the drafting of the sublease was a mere technical error, it is plain that the general rule construing a contract strictly against reformation (16 NY Jur 2d, Cancellation and Reformation of Instruments, § 36) should prevail (*Metzger v Aetna Ins. Co.*, 227 NY 411, 417). As stated in *Amend v Hurley* (293 NY 587, 595), "Before defendant can be granted reformation, *he must establish his right to such relief by clear, positive and convincing evidence.* Reformation may not be granted upon a probability nor even upon a mere preponderance of evidence, but only upon a certainty of error * * * Nor may the defendant secure reformation merely upon a showing that he or his attorney made a mistake."

No factual issue is raised requiring a trial. The claim Arlen asserts as a basis for reformation of the sublease is "mistake". But in order to base reformation of an instrument upon a claim of mistake, what must be shown is either mutual mistake or mistake on one side induced by fraud on the other (*Eastern Air Lines v Trans Caribbean Airways*, 29 AD2d 379, *affd* 23 NY2d 709). A trial of the issue would require the introduction of parol evidence to vary the clear and unambiguous language of the sublease (*Mallad Constr. Corp. v County Fed. Sav. & Loan*, 32 NY2d 285). Even if such evidence were admissible, it would not establish fraud or mutual mistake. The very documents submitted demonstrate there was no mutual mistake (*Zion v Kurtz*, 50 NY2d 92, 105). As Justice Stevens noted in *Eastern Air Lines* (*supra,* p 383), "A mere claim of mutual mistake does not establish the fact. There is no evidence sufficient to raise the issue of mutual mistake. It thus becomes evident that plaintiff at a trial could not meet the standard of proof required to warrant the equitable relief of reformation."

This case is ripe for summary judgment. Concur—Sandler, J. P., Carro, Asch, Fein and Milonas, JJ.