NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

v.

WALTON INSURANCE LIMITED, Defendant.

No. 86 CIV. 8571 (SWK).

United States District Court, S.D. New York.

Sept. 14, 1988.

Donovan, Maloof, Walsh and Repetto, New York City by David R. Hornig, for plaintiff.

Wilson, Elser, Moskowitz, Edelman and Dicker, New York City by Perry Kreidman, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") brought this action against defendant Walton Insurance Limited of Bermuda ("Walton") for breach of contract with respect to a reinsurance agreement between the parties involving the Interstate Towers Insurance Program ("Interstate Towers"). Presently before this Court are defendant's motion for an order of summary judgment on and dismissal of plaintiff's claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule").

Plaintiff maintains that defendant is and continues to be in breach of the Interstate Towers reinsurance agreement by nonpayment of claims involved in that agreement. Plaintiff asserts: that all of the communications and negotiations leading up to a 1984 release agreement signed by the parties concerned three other reinsurance programs but never involved Interstate Towers; that defendant and its agents were specifically advised that Interstate Towers was not part of this release; that plaintiff kept no record of any reference numbers assigned to reinsurance agreements by defendant and that the use of such reference numbers in the release was solely for defendant's internal benefit and bookkeeping records; that the release makes no reference to the Interstate Towers program by name; and that defendant's agent, "surreptitiously and without advising" plaintiff, changed the contract number on the release presented to the plaintiff for signature from that which appeared on the initial drafts. Defendant moves for summary judgment on the ground that plaintiff's claims are barred by the release which was negotiated in good faith and which unequivocally discharges Walton from any liability to National Union arising under the Walton contract.

## BACKGROUND

In late 1983, plaintiff insured four programs which were administered for plaintiff by American International Group Risk Management, Inc. ("AIGRM") and which were reinsured by defendant: (a) United Bus Owners of America ("UBOA"); (b) Delaware Valley Underwriting Association ("DVUA"); (c) Independent Owner Operator Exchange ("IOOE"); and (d) Interstate Towers. The DVUA and Interstate Towers programs were both underwritten and managed on National Union's behalf by the same insurance agency, the Delaware Valley Underwriting Agency, Inc. The two insurance programs, however, involved separate reinsurance agreements, billings, loss reports, statements and underwriting years.

A commutation agreement is a contract by which a reinsured party assumes some or all of a reinsurer's liability in return for which the reinsurer pays an agreed upon price to the reinsured. Plaintiff and defendant reached such a commutation agreement after approximately six months of negotiations beginning in late 1983. Walton was represented in these negotiations by an insurance brokerage firm, Johnson & Higgins ("J & H"), which assigned one of its vice presidents, Howard Metzger ("Metzger") to represent Walton. National Union, in turn, was represented by various AIGRM employees including: President Joseph Smetana ("Smetana"), Vice President and Actuary Frank Neuhauser, Jr. ("Neuhauser"), Vice President and General Counsel Martin Banker ("Banker") and Jonathan Roberts ("Roberts").

On March 5, 1984, Neuhauser made a written offer to Walton for the commutation of Walton's liability under the UBOA program. Metzger, after receiving this offer, attended a meeting with Neuhauser and Roberts at which he rejected the March 5 offer and said that Walton was interested in commuting its liability under additional programs as well. When Interstate Towers was mentioned at this meeting, according to plaintiff, Metzger stated that he was unaware of any interest on Walton's part in commuting that program. Metzger maintains, to the contrary, that in his conversation with Neuhauser he sought the commutation of all outstanding programs

between National Union/AIGRM and Walton.

On April 16, 1984, based upon computations which did not include any reference to financial data concerning Interstate Towers, Neuhauser made a written offer for the commutation of Walton's liability to National Union on the UBOA, DVUA and IOOE programs. When Metzger requested additional financial information so that he could evaluate the proposal, he was sent a report including a breakdown of loss and payment information on these three programs and the computations by Roberts which had been utilized to develop the April 16th offer. With the purpose of reconciling certain financial information relating to the proposed commutation, Roberts met with Walton's President Tim Spafford in Bermuda on May 30, 1984. The UBOA, DVUA and IOOE information was reconciled but, again, no financial data pertaining to Interstate Towers was discussed. Roberts alleges that, at this meeting, Tim Spafford asked him why Interstate Towers was not part of the proposed commutation. Roberts further alleges that he advised Spafford that Interstate Towers was not being considered for commutation and that the price quoted for the proposed commutation did not include Interstate Towers. Spafford does not recall such a conversation. Rather he viewed the purpose of the meeting with Roberts as being a reconciliation of certain accounts which were not necessarily the only accounts to be included in the proposed commutation.

On or about June 13, 1984, Metzger prepared a first draft of the proposed commutation agreement, entitled "Advice of Insurance," on J & H stationery. The contracts which were identified in this draft as DVUA contracts to be included in the commutation agreement were Walton contract numbers 12652 and 12384. Contract 10652 was not mentioned. Banker, after reviewing Metzger's draft, prepared a second draft of the commutation agreement on a standard, New York Blumberg form. This draft, again, referred to Walton's contract numbers 12652 and 12384 under the DVUA and did not mention contract number 10652.[1] Metzger then had the final release—in which the contract number 12652 as used in the first two drafts was replaced by 10652 [2]—typed on J & H letterhead. Metzger did not advise anyone at AIGRM or National Union of this unilateral alteration on his part. The final release reads, in pertinent part: "National Union ... releases and discharges Walton Insurance Company, Ltd. ... from all actions ... [and] contracts ... arising under ... Walton Contract numbers 10652, 12384 (Delaware Valley Underwriting Association Program, DVUA)." This release prepared by Metzger was signed on behalf of National Union by Smetana, and that signature was notarized by Banker, on June 27, 1984.

According to Walton, Banker never objected to the use of Walton contract numbers in the drafts or in the release and did not question any Walton representative as to the meaning of the Walton numbers. National Union claims that it keeps no record of reference numbers which may be assigned to agreements by the "hundreds of reinsurance companies" it deals with worldwide, but refers to reinsurance programs by account name. Any reference to Walton contract numbers in the release, plaintiff asserts, was only for defendant's internal benefit and bookkeeping records. Defendant, however, claims that plaintiff had either knowledge or constructive knowledge that Walton contract number 10652 was the Interstate Towers reinsurance agreement. The number "10652/80"

---

1. Banker's draft did, however, add two other new contract numbers—1064 and 11325—to those listed by Metzger in his "Advice of Insurance."

2. Walton number 12652, apparently, was the reference number assigned by Walton in 1983 to a contract with the Oriental Insurance Corporation and had nothing to do with either National Union or any other AIGRM company. It is noteworthy that the final release embodies another alteration of the contract numbers enumerated in Banker's draft. Specifically, the number 1064 added by Banker in the second draft, which has no apparent significance, was changed in the final Release to 10464 which is a Walton number for one of the reinsurance contracts within the UBOA program between the parties.

was affixed by Walton beneath its signature on the Interstate Towers contract approximately fifteen days before that contract was executed by National Union. Furthermore, prior to January 3, 1984, Metzger sent a computer printout to James P. Bryce of American International Underwriters which summarized all the reinsurance contracts between Walton and AIGRM and which contained the Walton contract numbers subsequently utilized in the two drafts and release. National Union asserts, however, that this printout was never conveyed by Bryce or by American International Underwriters to AIGRM, which had actual responsibility for negotiating the release.

In consideration for the commutation of its liability, Walton agreed to pay National Union a total of $24,475,000 in three installment payments as set forth in Rider No. 1 of the release: $15,125,000 on or before June 30, 1984; $7,000,000 on or before September 30, 1984; and $2,350,000 on or before December 31, 1984. The funding mechanism for these payments was a $22,-250,000 letter of credit ("L.O.C.") posted by Walton in December 1983 in favor of National Union, which National Union utilized to obtain payment of the installments under the release and as security for the remaining installments. Thus, each time a payment was made by Walton, the amount of the L.O.C. was reduced accordingly by instructions from Walton to the bank and agreement of National Union. Walton contract 10652 was listed as one of the contracts secured by the L.O.C.

According to Walton, National Union first advised Metzger in late September of 1984 that it had not intended that Walton contract 10652 be included in the release. Through October 1985, the parties exchanged correspondence regarding the inclusion of contract 10652 in the release. National Union nevertheless accepted, on schedule as provided by the release, the second and third installment payments due from Walton. After payment of each installment, the L.O.C. containing the reference to Walton contract 10652 was reduced accordingly, by agreement of the parties, so that it reached a zero balance at the end of 1984.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

Plaintiff contends that the reinsurance programs between National Union/AIGRM and Walton were commonly referred to by

name rather than by contract number and that the failure of the release to mention Interstate Towers by name creates grounds for ambiguity and presents a triable issue of fact as to whether or not Interstate Towers was included in the release. Defendant maintains that the release is clear and unambiguous on its face and that the court should therefore enforce the plain meaning of the release and should not consider parole or other extrinsic evidence in determining the meaning of the release. The release, defendant asserts, constitutes an absolute defense to National Union's breach of contract claim.

It is well-settled that a valid release constitutes a complete bar to an action on a claim which is the subject of the release. *Omaha Indemnity Co. v. Johnson & Towers, Inc.,* 599 F.Supp. 215, 220 (E.D.N.Y. 1984) (applying New York law); *Najjar Industries, Inc. v. City of New York,* 57 N.Y.2d 647 at 648, 439 N.E.2d 874, 454 N.Y.S.2d 65. Where "the contract's language admits of only one reasonable interpretation, the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the contract's meaning." *American Home Products Corp. v. Liberty Mutual Insurance Co.,* 748 F.2d 760, 765 (2d Cir.1984) (citing *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978)). "[W]here ... 'the intention of the parties may be gathered from the four corners of the instrument' ... 'interpretation of the contract is a question of law ... [and] no trial is necessary to determine the legal effect of the contract.'" *Leslie Fay, Inc. v. Rich,* 478 F.Supp. 1109, 1113–14 (S.D.N.Y.1979) (quoting *General Phoenix Corp. v. Cabot,* 300 N.Y. 87, 92, 89 N.E.2d 238, 241 (1949)). Then summary judgment may be appropriate.

However, where contract language is subject to more than one interpretation, a triable issue of fact is presented by the differing interpretations and summary judgment is inappropriate. *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985). Then parole and other extrinsic evidence may be introduced to facilitate the resolution of the factual question presented. *Bank of America National Trust and Savings Association v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985) (citing *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir.1975)).

■ The relevant portion of the release states that "National Union ... releases and discharges Walton ... from all actions, causes of action, suits ... claims and demands whatsoever, in law ... or equity, ... for ... any and all liability, losses, claims or expenses arising under Walton Contract numbers ... 10652, 12348 (Delaware Valley Underwriting Association Program, DVUA)." This Court cannot agree with National Union's contention that this language is susceptible to more than one reasonable interpretation.

Each account included in the release is designated by two identifiers: 1) primarily by its Walton contract number and 2) secondarily, only parenthetically, by its account name. The primary means of designating Interstate Towers for inclusion in the release—the Walton number 10652—is beyond question as to its referent. The second means of designation—the parenthetical "Delaware Valley Underwriting Association Program, DVUA" is a conceivable, secondary means of designating an account which was in fact underwritten and managed on National Union's behalf by the Delaware Valley Underwriting Agency, Inc. Had the only, or even the primary, means of designating accounts for inclusion in the commutation agreement been by program name—i.e., "Delaware Valley Underwriting Association Program, DVUA" by itself or with only a parenthetical reference to Walton contract 10652— there would be some credibility to National Union's assertion that the language is ambiguous. But, in the release as drawn, the Walton contract number unquestionably identifies the Interstate Towers agreement and the parenthetical account name pro-

vides only secondary description.[3]

The release unambiguously and unequivocally, on its face, discharges the defendant from liability to the plaintiff with regard to the Interstate Towers program. Inasmuch as the language of the release is susceptible to only one reasonable interpretation, and the intention of the parties may be gathered from within the four corners of the document, this Court will not look to parole or other extrinsic evidence to ascertain the contract's meaning. Where a contract is unambiguous, interpretation is a function for the court and matters extrinsic to the contract may not be considered when the intent of the parties can be gleaned from the face of that contract. *Dannhardt v. Donnelly*, 604 F.Supp. 796, 803 (E.D.N.Y.1985). Nor may parole evidence be introduced to vary or contradict the terms of an unambiguous release. *Schine v. Schine*, 250 F.Supp. 822, 825 (S.D.N.Y. 1966).

Plaintiff also contends that the granting of summary judgment to defendant is inappropriate in this case because of the unilateral alteration of the contract number by Walton's agent in the final release and without notification to National Union. National Union contends that "[c]ourts are most reluctant to grant summary judgment where there is any evidence of fraud, misrepresentation or fraudulent inducement. *ACLI Intern. Comm. Serv. v. Banque Populaire Suisse*, 609 F.Supp. 434 (S.D.N.Y. 1984)." Walton argues that summary judgment is warranted because National Union provides no proof to the Court of the fraud, misrepresentation, or concealment necessary to warrant taking this case to trial.

Even though the language of an agreement be clear and unambiguous on its face, the court may still reform or rescind that agreement where it finds either mutual mistake or one party's unilateral mistake coupled with some fraud or wrongful conduct of the other party. *John Hancock*

*Mutual Life v. Carolina Power & Light*, 717 F.2d 664, 671 (2d Cir.1983) (citing *Brandwein v. Provident Mutual Life Insurance Co.*, 3 N.Y.2d 491, 496, 146 N.E.2d 693, 695, 168 N.Y.S. 964, 967 (1957)). Unilateral mistake without fraud or wrongful conduct, however, is not a sufficient ground for contract rescission or reformation. *See e.g., Gaylords National Corp. v. Arlen Realty Development Corp.*, 112 A.D.2d 93, 96, 491 N.Y.S.2d 649, 652 (A.D. 1 Dept.1985); *Bayley Ford, Inc. v. Bayley*, 55 A.D.2d 729, 730, 389 N.Y.S.2d 181, 183 (A.D. 3 Dept.1976). According to New York common law, which this Court must look to in this diversity case, "the following elements must be established to sustain an action for fraudulent misrepresentation: (1) misrepresentation, concealment or nondisclosure of a material fact; (2) intent to deceive on the part of the defendant; (3) justifiable reliance upon the misrepresentation by the plaintiff; and (4) injury to the plaintiff as a result of such reliance." *Idrees v. American University of the Caribbean*, 546 F.Supp. 1342, 1346 (S.D.N.Y. 1982) (citations omitted).

Defendant maintains that it intended by means of the release to obtain a commutation of its liability to National Union for the Interstate Towers program/Walton contract number 10652. The release is not, therefore, an instance of mutual mistake but of unilateral mistake by the plaintiff. Plaintiff's allegations, however, do not support several of the elements required to create a material question of fact as to actionable fraud committed by the defendant. There is no evidence of misrepresentation, concealment or nondisclosure by defendant of the fact that Interstate Towers was included in the final release inasmuch as the final release itself provides full disclosure on its face by its reference to Walton contract number 10652.

■ There was no duty on Walton's part to explain the contents of the release to National Union and, therefore, a claim by National Union of misrepresentation or

---

**3.** The first draft of the release, prepared by Walton, used the account name as the primary means of identification and the Walton contract numbers as a secondary means. It was in fact the second draft, prepared ironically by National Union's own agent Banker, which altered the format so that the language of the release relied primarily for account designation on the Walton contract numbers and only secondarily on the account name.

nondisclosure by Walton is not supported. In *Graham v. Meyer*, 99 N.Y. 611, 1 N.E. 143 (1885), the court ruled that a defendant-debtor was under no duty of disclosure to the plaintiff-creditor during the negotiation of a release. The defendant:

> ... did nothing to mislead [plaintiff] ... or prevent him from inquiring, or to throw him off from his guard. They negotiated at arms' length. The defendant was in no trust or confidential relationship with him ... He bore the simple relation to him of debtor ... If either party desires information from the other he must ask for it, and then he must not be misled or deceived by answers given. *Id.* at 613–14 [1 N.E. 143].

While negotiating a release involving nearly $25,000,000, Walton and National Union were dealing at arms' length—substantially in a debtor-creditor relationship—and were certainly not in a trust or confidential relationship. National Union could have inquired concerning the contents of the release at any time.

Nor is there any allegation by plaintiff of its justifiable reliance upon defendant's imputed misrepresentation, or that plaintiff was injured as a result of such reliance. First, plaintiff could not have relied on the inclusion of Walton contract number 12652 in the commutation agreement, as it had been included in the two drafts, because that contract was between Walton and a third party and had no connection at all with National Union. It would be senseless for plaintiff to contend that the erroneous reference to 12652 in the first two drafts should have been carried through to the final draft. Nor did any of plaintiff's agents, including its attorney, make any inquiries to Metzger or Walton concerning the numbers or any effort to ascertain the meaning of the contract numbers. Plaintiff offers no evidence that it reasonably or justifiably relied upon the Walton contract numbers in the "Advice of Insurance" as compared with those finally incorporated in the release. National Union's claim of Walton's fraud in the alteration of the contract numbers in the final release therefore fails as a matter of law, because plaintiff's failure to apprise itself of the contract numbers' meaning demon-strates a complete lack of reliance by National Union on, indeed a total disregard of, the Walton contract numbers in the two drafts. National Union representatives apparently accepted the Walton contract numbers in the drafts and in the final release with complete indifference as to their meaning.

Absent a showing of fraud or other misconduct, a party seeking to overturn an otherwise unambiguous contract on the grounds of mistake bears a heavy burden because there is a conclusive presumption that a party who signs a contract has knowledge of its contents, assents to the contents, and is thus bound by the contract. *Brener v. Becker Paribas, Inc., A.G.*, 628 F.Supp. 442, 446 n. 3 (S.D.N.Y.1985). It is well-settled that, where a party executes a release prepared by his attorney after prolonged negotiations, he is bound thereby. *Aaron Ferrer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 124 (2d Cir. 1984); *Lucio v. Curran*, 2 N.Y.2d 157, 161, 139 N.E.2d 133, 135, 157 N.Y.S.2d 948, 951 (1956). The release in question here is not a lengthy or complicated document. It is a simple document based largely, and at the insistence of National Union's attorney, upon a Blumberg form release. The relative simplicity of the terms of the release strengthens the presumption that National Union had knowledge of, and assented to, the terms of the release. This presumption is further strengthened in that the release was the result of prolonged arms' length negotiations between the parties. Moreover, National Union was represented by independent counsel who took part in the negotiations and who himself actively participated in preparing the release.

The Supreme Court ruled in *Grymes v. Sanders*, 93 U.S. 55, 61, 23 L.Ed. 798 (1876) that, for a mistake defense to be available to a party to a contract, it "must not have arisen from negligence, where the means of knowledge were easily accessible." The New York Court of Appeals expressly reaffirmed this *Grymes* case rule in *Da Silva v. Musso*, 53 N.Y.2d 543, 551, 428 N.E.2d 382, 386, 444 N.Y.S.2d 50, 54 (1981). If National Union signed the release mistakenly, it did so as a result of its own carelessness and, therefore, is

barred from contesting the release's validity on the grounds of mistake. This Court will not go so far as to assert that, by means of the Walton contract number added to the Interstate Towers agreement by Walton, plaintiff should have known the meaning of Walton contract number 10652. It is obvious from the language of the release, however, that the Walton contract numbers are the primary means of identifying the accounts which are included in the release. If National Union did not know the meaning of the Walton contract numbers it could have, and most assuredly should have, determined their meaning by simple inquiry at any time prior to the execution of the release.

## CONCLUSION

National Union's breach of contract claim is barred as a matter of law, by the release which clearly and unambiguously discharges Walton from all liability under the contract which is the subject of this claim. This Court accordingly grants defendant's motion for an order of summary judgment pursuant to Rule 56 and dismisses plaintiff's claim.

SO ORDERED.