945 F.2d 40
 Gordon E. ALLEN; John Currier; James J. Dunne; Leo
Fornero; Gerard P. Mandry; Norman K. Matheson;
Bruce E. Moore; Nicholas Pallota;
Cochran B. Supplee,
Plaintiffs-Appellants,
v.
WESTPOINT-PEPPERELL, INCORPORATED; D. Michael Roark; C.
Powers Dorsett; Barry F. Shea, Defendants-Appellees.
 Nos. 1678, 1679, Dockets 91-7230, 91-7374.
 United States Court of Appeals,
Second Circuit.
 Argued June 25, 1991.
Decided Sept. 11, 1991.
 
 Robert J. Hausen, New York City (Stanley S. Arkin, Chadbourne & Parke, of counsel), for plaintiffs-appellants.
 Francis Carling, New York City (Michael A. Kalish, Frederick A. Brodie, Winthrop, Stimson, Putnam & Roberts, of counsel), for defendants-appellees.
 Before CARDAMONE, MINER and MAHONEY, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Gordon E. Allen, John Currier, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Bruce E. Moore, Nicholas Pallotta and Cochran B. Supplee (collectively, "appellants") appeal from a judgment entered in the United States District Court for the Southern District of New York (Conboy, J.) granting the motion of defendants-appellees WestPoint-Pepperell, Inc., D. Michael Roark, C. Powers Dorsett and Barry F. Shea (collectively, "WestPoint") to dismiss appellants' complaint pursuant to Fed.R.Civ.P. 12(b)(6).
 
 
 2
 We hold that appellants state in their complaint an adequate claim for rescission of an agreement releasing WestPoint from certain contractual obligations. Accordingly, we reverse the judgment dismissing the complaint and remand the case for further proceedings.
 
 BACKGROUND
 
 3
 Appellants are nine former senior executives of Cluett Peabody & Co., the manufacturer of Arrow shirts and other wearing apparel. WestPoint-Pepperell, Inc. is a Georgia textile and apparel manufacturer, which was Cluett's parent company from January 1986, when it first acquired Cluett, until March 1990, when it sold the company to Bidermann Industries U.S.A., Inc. All appellants are domiciled in states other than Georgia. It appears undisputed, for all purposes related to the captioned action, that Westpoint-Pepperell is the successor obligor of Cluett Peabody.
 
 
 4
 On June 6, 1990, appellants filed the complaint initiating this action. In their complaint, appellants alleged the following:
 
 
 5
 In the mid-1970's, Cluett agreed with its senior executives to institute an Executive Permanent Insurance Program ("EPI Program" or "Program"), under which deferred compensation benefits would be paid to the senior executives. Under the EPI Program, a participant, upon reaching age 65, would be entitled to receive 30% of his final base salary for life, with payments of half that amount being made to a designated beneficiary upon the participant's death. Each participant, including appellants, signed a separate, identical contract, known as an EPI Program Agreement ("EPI Agreement").
 
 
 6
 On October 24, 1988, Farley, Inc. ("Farley") commenced a hostile tender offer for all outstanding shares of WestPoint common stock. At that time, Farley controlled approximately 9.8% of WestPoint's outstanding common stock, and, by November 21, 1988, it controlled 35.17%. In anticipation of a takeover, WestPoint offered the EPI Program participants the opportunity to subscribe to a favorable change in the terms of the agreement, sending each participant on or about November 11, 1988 an amendment form ("EPI Amendment") dated that date. A copy of the EPI Amendment was attached to appellants' complaint. By signing and returning to WestPoint the form, the participant would agree to the amended program. Each of the appellants signed and returned the form.
 
 
 7
 Under the EPI Amendment, in the event of a "Change of Control" of the company, a participant would be entitled to receive from WestPoint lump sum payments in an amount equal to the "Actuarial Equivalent" of the participant's retirement benefit under the Program. A "Change in Control" occurred if, among other things, "any individual, corporation, ... or other person ... is or becomes the Beneficial Owner of Securities of WestPoint representing twenty percent (20%) or more of the combined voting power of WestPoint's then outstanding securities." The EPI Amendment defined "Actuarial Equivalent" as an amount having "the same present value as the Accrued Benefit." To calculate the Actuarial Equivalent, the EPI Amendment referred to "the actuarial assumptions contained in Cluett's Employee Retirement Plan," the pertinent provisions of which were quoted in the complaint. That Plan provided
 
 
 8
 "Actuarial Equivalent" means an amount of equal value when computed on the basis of interest, mortality and other tables as shall be adopted from time to time by the [Cluett Pension] Committee on the advice of the Actuary, the current factors being as specified below:
 
 
 9
 1. Mortality table. The ... 1971 Group Annuity Mortality Table projected to 1978....
 
 
 10
 2. Interest rate[1]. 5% per annum, compounded annually.
 
 
 11
 3. Other factors. None.
 
 
 12
 On February 3, 1989, WestPoint's Board of Directors announced that the company would be sold to the highest bidder. Company management considered a leveraged-buyout, and, according to the complaint, entered into discussions with Merrill Lynch Capital Partners to explore methods of enhancing the company's value in order to justify a higher bid. Appellants alleged that the conduct for which WestPoint was liable was part of a scheme to resist a takeover and, once a takeover became inevitable, "to extract higher benefits" for the individual defendants.
 
 
 13
 At approximately the same time as the announcement of sale, WestPoint's actuary sent to the Cluett Pension Committee a letter in which he recommended that the discount rate in the Cluett Employee Retirement Plan be changed from 5% to a floating rate of 120% of the Pension Benefits Guaranty Corporation (PBGC) discount rate. On February 16, 1989, the Cluett Pension Committee, of which Dorsett and Shea were members, met and adopted the recommended floating rate. Appellants alleged that the management determined it could enhance the company's value by $4 million if the discount rate to be applied in calculating the lump sum payments were increased to 9.3%.
 
 
 14
 On February 22, 1989, Roark, WestPoint's Vice-President for Human Resources, sent each EPI Program participant a letter, a copy of which was attached to the complaint. The letter stated,
 
 
 15
 There has apparently been some confusion as to the method of calculation to be employed in determining the lump sum benefit under the [amended EPI Agreements]. Some participants have told us that they were led to believe that a 5% discount rate would be used to determine lump sum values. This is incorrect. The formula under the Cluett Employee Retirement Plan which is referenced in the November 11, 1988, amendment calls for converting monthly annuities to lump sum amounts as follows: 120% of the [PBGC] immediate interest rate.
 
 
 16
 Roark wrote that, "during February 1989," the floating rate equaled 9.3%. The letter went on to state,
 
 
 17
 Because of the confusion regarding the discount rate, we are giving you an opportunity to revoke the amendment and are enclosing an election form which is to be used to affirm or revoke the November amendment.... In the event of a change in control, no lump sum payment of your deferred compensation benefit will be made until we have received the enclosed election form.
 
 
 18
 A copy of the election form also was attached to the complaint. Each appellant signed and returned the form, checking the box next to a provision that "I understand that the lump sum payment of the actuarial equivalent of my deferred compensation benefit will be in full satisfaction of all obligations of [WestPoint], as successor to [Cluett], ... and that in accepting a lump sum payment I shall thereby release [WestPoint] ... from all obligations under the [EPI] Agreement."
 
 
 19
 On February 23, 1989, WestPoint publicly announced that it had entered into a definitive merger agreement with Farley. On April 5, 1989, Farley's tender offer was consummated, and, that same day, WestPoint sent to each plaintiff a check representing the lump sum amount due them, calculated on the basis of a 9.3% discount rate. The enclosed cover letter provided, "By cashing this check you acknowledge that the Company's obligation to make informal [periodic] payments has been fully satisfied." A copy of the cover letter was attached to the complaint. Each of the appellants cashed his check, alleging in the complaint that they did so in reliance on WestPoint's "represent[ation] that the Change in Control did not occur until April 5, 1989 and that [their] lump sum payments were properly calculated on the basis of a 9.3% discount rate."
 
 
 20
 Appellants filed this action on June 6, 1990, based on diversity jurisdiction, claiming breach of contract, breach of fiduciary duty, fraud and violation of New York Labor Law. Appellants also sought a declaratory judgment that the release and cashing of the checks "in no way constitute[d] a release," arguing that the releases were based on fraud and mistake. On August 3, defendants moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6), contending that, as a matter of law, plaintiffs had released their claims. The district court granted the motion to dismiss in an order dated January 25, 1991 (later amended to correct a clerical error). Judge Conboy held that the releases barred recovery, finding that the February 22 letter was not deceptive and withheld no material information, that the adoption of the floating rate was not a proper basis for a claim of fraud, that no fiduciary relationship existed, and that the clear language of the releases did not allow for mutual mistake. The district court also held that the Labor Law claims were groundless.
 
 
 21
 In his Memorandum and Order, Judge Conboy referred to a related case over which he presided, Krumme v. WestPoint-Pepperell, Inc., 735 F.Supp. 575 (S.D.N.Y.1990). Robert Krumme, the plaintiff in that case, was the former counsel for Cluett and, like the appellants, participated in the EPI Program. Unlike the appellants, however, Krumme chose not to sign the release form included with Roarke's letter of February 22 and, instead, on March 24, 1989, filed an action against WestPoint, claiming that the failure to pay a lump sum discounted at 5% amounted to a breach of the EPI Amendment. On April 19, 1990, Judge Conboy denied each side's motion for summary judgment in Krumme and ordered that the case proceed to trial. In deciding the present case, the district court noted that "the 9.3% rate had, in fact, been adopted by [WestPoint] and whether or not [9.3%] was the 'proper' rate as a matter of contract is fairly in contention as a result of our Krumme summary judgment order," and thus fraud could not be inferred from the representations made in the February 22 and April 5 letters. Judge Conboy found an unnecessary delay in appellants' initiation of this suit because they waited until shortly after the denial of summary judgment in the Krumme case to file this action.
 
 
 22
 After Judge Conboy dismissed appellants' complaint, they moved for reargument based upon documents introduced in Krumme. On April 2, 1991, the district court granted the motion for reargument and, upon reconsideration, adhered to its previous ruling.
 
 DISCUSSION
 
 23
 Review of the grant of a motion under Fed.R.Civ.P. 12(b)(6) is de novo. Austern v. Chicago Bd. Options Exchange, Inc., 898 F.2d 882, 885 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990). In ruling on a motion to dismiss, a court must construe in plaintiff's favor any well-pleaded factual allegations in the complaint. See Finnegan v. Campeau Corp., 915 F.2d 824, 826 (2d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1624, 113 L.Ed.2d 721 (1991); Aeronca, Inc. v. Gorin, 561 F.Supp. 370, 375 (S.D.N.Y.1983). In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken. Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. June 27, 1991). Dismissal of the complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted); see Lipsky v. Commonwealth United Corp., 551 F.2d 887, 894-95 (2d Cir.1976).
 
 
 24
 WestPoint contends that appellants released it from any liability under the EPI Agreement and Amendment and therefore may not pursue this action. Under New York law, which governs our decision in this diversity case, "[i]t is well-settled that a valid release constitutes a complete bar to an action on a claim which is the subject of the release." National Union Fire Ins. Co. v. Walton Ins. Ltd., 696 F.Supp. 897, 901 (S.D.N.Y.1988); see Najjar Indus., Inc. v. City of New York, 57 N.Y.2d 647, 648, 439 N.E.2d 874, 874, 454 N.Y.S.2d 65, 65 (1982). However, even where, as here, the language of a release is "clear and unambiguous on its face, the court may still ... rescind that [release] where it finds either mutual mistake or one party's unilateral mistake coupled with some fraud ... of the other party." National Union, 696 F.Supp. at 902; see 19 N.Y.Jur.2d Compromise, Accord & Release § 94, at 458 (1982). Appellants argue that they were induced by fraud into signing the releases or, alternatively, that the parties signed the releases based on a mutual mistake, and, therefore, that rescission is appropriate.
 
 
 25
 The elements of a claim for rescission based on fraud are misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party. National Union, 696 F.Supp. at 902; Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 406-07, 151 N.E.2d 833, 835, 176 N.Y.S.2d 259, 262 (1958). Fed.R.Civ.P. 9(b) requires that fraud claims be pleaded with particularity, and " '[m]ere general allegations that there was fraud, corruption or conspiracy or characterizations of acts or conduct in these terms are not enough [to survive a Rule 12(b)(6) motion] no matter how frequently repeated.' " Segal v. Gordon, 467 F.2d 602, 607 (2d Cir.1972) (citation omitted).
 
 
 26
 Construing the factual allegations in the complaint in appellants' favor, we conclude that they state a claim for rescission under New York law sufficient to withstand a challenge under Rule 12(b)(6). Appellants allege in their complaint that because of WestPoint's intentional misrepresentations and concealment of material information which it had a duty to disclose, they reasonably believed that the full lump sum amount they were entitled to was based on a 9.3% discount rate. Appellants allege specifically the misrepresentations on which they relied, the time and manner in which the misleading statements were made, and the names of those who made the statements, thereby satisfying Rule 9(b). See Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989).
 
 
 27
 The district court erred in finding that the purported change in the discount rate from 5% to 120% of the PBGC rate at the February 16 meeting, a change which was not disclosed to appellants, was an immaterial fact. A fact may not be dismissed as immaterial unless it is "so obviously unimportant ... that reasonable minds could not differ on the question of [its] importance." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985); see also Saxe v. E.F. Hutton & Co., Inc., 789 F.2d 105, 111 (2d Cir.1986). Under New York law, "[a]s a general rule, it presents a question of fact for the jury to determine whether [a nondisclosure] was a material one or not." Chiodo v. Garramone, 11 Misc.2d 743, 744, 175 N.Y.S.2d 490, 492 (Sup.Ct.1958). Here, the nondisclosure of the change in the discount rate at the February 16 meeting, coupled with representations of WestPoint that carried the implication that the discount rate under the November 11, 1988 EPI Amendment always had been 120% of the PBGC rate, supports the fraud claim. At this stage of the litigation, the change of rate adopted at the February 16 meeting cannot be considered immaterial.
 
 
 28
 The district court also erred in holding that the complaint could not support a claim of a duty requiring disclosure of the change in the rate at the meeting. Although no fiduciary duty under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. (1988), could be pleaded with respect to the EPI Agreement, appellants set forth sufficient factual allegations to support their contention that a duty to disclose arose at common law. Under New York law, a fiduciary relationship includes "both technical fiduciary relations and those informal relations which exist whenever one [person] trusts in, and relies upon, another." Penato v. George, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904-05 (2d Dep't 1976); see also Mitzner v. Jarcho, 44 N.Y.2d 39, 44, 374 N.E.2d 388, 390, 403 N.Y.S.2d 490, 492-93 (1978) (recognizing importance of "the fiduciary obligations borne by [pension plan] trustees for the benefit of the employees."). Given that appellants already had earned the benefits due them under the Program at the time the Pension Plan Committee met to increase the discount rate, we cannot conclude that no common-law fiduciary relationship existed.
 
 
 29
 Furthermore, even if no fiduciary relationship arose under those circumstances, a duty to disclose may "arise when one party to a contract has superior knowledge which is not available to both parties." Young v. Keith, 112 A.D.2d 625, 627, 492 N.Y.S.2d 489, 490-91 (3d Dep't 1985); see also Haberman v. Greenspan, 82 Misc.2d 263, 265, 368 N.Y.S.2d 717, 720 (Sup.Ct.1975); cf. Stambovsky v. Ackley, 572 N.Y.S.2d 672, 676 (1st Dep't 1991). Here, according to the complaint, WestPoint had access to critical information regarding the administration of the pension plan, including the occurrence of the meeting where the rate was changed, that appellants did not have.
 
 
 30
 WestPoint argues correctly that a representation based on a good faith misinterpretation of the legal effect of an agreement does not provide a basis for a fraud claim. See George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 220, 385 N.E.2d 1062, 1067, 413 N.Y.S.2d 135, 140 (1978); Zuyder Zee Land Corp. v. Broadmain Bldg. Co., 86 N.Y.S.2d 827, 828 (Sup.Ct.), aff'd, 276 A.D. 751, 92 N.Y.S.2d 607 (1st Dep't 1949). However, appellants claim that WestPoint's representations were not based on its good faith misinterpretation of the EPI Amendment. The complaint alleges that WestPoint not only believed the appropriate discount rate was 5% and represented 9.3% as the correct rate, but also that WestPoint concealed the occurrence of the February 16 meeting at which the rate was changed. See In re Estate of Cohen, 18 Misc.2d 163, 165, 186 N.Y.S.2d 437, 439 (Sur.Ct.1959) (citing Haviland v. Willets, 141 N.Y. 35, 50, 35 N.E. 958, 960 (1898)). Even though fraud is generally confined to situations involving misrepresentations of fact, an expression of an intentionally false opinion on a matter of law may be actionable where a relationship of trust exists, as is alleged here. See Callahan v. Callahan, 127 A.D.2d 298, 300, 514 N.Y.S.2d 819, 821 (3d Dep't 1987); Hutchins v. Utica Mutual Ins. Co., 107 A.D.2d 871, 872, 484 N.Y.S.2d 686, 687 (3d Dep't 1985); cf. Gediman v. Anheuser Busch, Inc., 299 F.2d 537, 544-46 (2d Cir.1962) (claim exists under New York law where employer negligently misrepresented to employee effect of election under pension plan).
 
 
 31
 It is alleged in the complaint that WestPoint intentionally misrepresented that the "Change in Control," which triggered the entitlement to lump sum payments, did not occur until April 5, 1989. According to the complaint, the entitlement may have been triggered before the February 16 meeting changing the rate from 5%, because Farley had gained control over 35.17% of WestPoint's outstanding common stock by November 21, 1988. Alternatively, under the sequence of events alleged in the complaint, a change in control may have occurred on February 23, 1989, when a merger agreement between Farley and WestPoint was announced; because the EPI Amendment defined the Control Date as "the end of WestPoint's fiscal month preceding the occurrence of a Change in Control," the 5% discount rate still may have been in effect at the time control actually was changed. In either case, WestPoint's representations that the discount rate was 9.3% ignored these reasonable interpretations of the plain language of the EPI Amendment. Combined with appellants' other allegations, the misinterpretation of the EPI Amendment provides inferential support for the fraud claim. See 60 N.Y.Jur.2d Fraud & Deceit § 237, at 801-02 (1987) ("Fraud often necessarily depends upon the inferences to be drawn from all the circumstances, and it is established where facts are proved from which it results as an unavoidable inference." (footnotes omitted)).
 
 
 32
 The alternative ground for rescission alleged by appellants is mutual mistake. The alleged mistake is the parties' mutual lack of awareness that, under the EPI Amendment, appellants were entitled to a lump sum amount calculated at a 5% discount rate. The complaint alleged that "[a]t the time each plaintiff executed the [release] and cashed his April 5, 1989 check, he reasonably believed that no Change of Control of WestPoint had occurred before April 5 and that the [proper] discount rate ... was 9.3%"; the complaint also alleged that WestPoint similarly was mistaken as to the Change of Control date and proper discount rate. The Change of Control date, which in this case determines the proper discount rate, is a question of fact that has not been resolved at this stage of the litigation.
 
 
 33
 The mistake was not, as the district court found, mere ignorance of a possible action for breach of the EPI Amendment, see Omaha Indemnity Co. v. Johnson & Towers, Inc., 599 F.Supp. 215, 219-20 (E.D.N.Y.1984), but a lack of awareness by both appellants and WestPoint that an "injury" had even occurred when WestPoint made the payments at the 9.3% discount rate, see Bushkin, Gaims, Gaines, Jonas & Stream v. Garber, 677 F.Supp. 774, 776 (S.D.N.Y.1988); Mangini v. McClurg, 24 N.Y.2d 556, 564, 249 N.E.2d 386, 391, 301 N.Y.S.2d 508, 514-15 (1969). The facts as alleged in the complaint implicate the necessary elements for rescission based on mutual mistake: both parties to the release shared the same erroneous belief as to a material fact, and their acts did not in fact accomplish their mutual intent. See Rekis v. Lake Minnewaska Mountain Houses, Inc., 573 N.Y.S.2d 331, 335 (3d Dep't 1991); Turner v. Mutual Benefit Health & Accident Ass'n, 5 Misc.2d 524, 530-31, 160 N.Y.S.2d 883, 890-91 (Sup.Ct.1957); 21 N.Y.Jur.2d Contracts § 121, at 528 (1982). We hold that appellants state in the complaint a claim of mutual mistake sufficient to survive a challenge under Rule 12(b)(6).
 
 
 34
 To the extent that the district court's decision was based on the timing of the filing of this action in relation to the date of the denial of defendants' motion for summary judgment in Krumme, we hold that this factor presents no bar. An action for rescission must be initiated without unreasonable delay, Schenck v. State Line Tel. Co., 238 N.Y. 308, 313, 144 N.E. 592, 594 (1924), unless the delay is caused by the party against whom rescission is sought, Yedlin v. Rubin, 219 A.D. 694, 699, 220 N.Y.S. 545, 549-50 (2d Dep't 1927), aff'd, 247 N.Y. 529, 161 N.E. 170 (1928). At this point in the litigation, however, there is little evidence probative of the reasonableness of any delay in bringing this action; for example, there is no evidence of when appellants learned of the Krumme action.
 
 
 35
 Finally, contrary to WestPoint's contention, the fact that plaintiffs retain the proceeds from the checks representing the allegedly inadequate lump-sum amounts does not bar their claim for rescission. See N.Y.Civ.Prac.L. & R. § 3004 (McKinney 1991); D'Angelo v. Bob Hastings Oldsmobile, Inc., 89 A.D.2d 785, 785, 453 N.Y.S.2d 503, 504 (4th Dep't 1982), aff'd, 59 N.Y.2d 773, 451 N.E.2d 471, 464 N.Y.S.2d 724 (1983).
 
 CONCLUSION
 
 36
 We reverse the judgment of the district court and remand the action for further proceedings.
 
 
 
 [1]
 The "Interest Rate" was actually the rate at which a participant's accrued retirement benefit would be discounted to present value before distribution. For purposes of this opinion, it will be referred to as the "discount rate."