**Sameer Y. ZAHR, Plaintiff,**

v.

**WINGATE CREEK ACQUISITION CORP., Erol Y. Beker, a/k/a E.Y. Beker, Tectrade International Ltd., and NMB Postbank Groep, NV, Defendants.**

**No. 91 Civ. 6871 (DNE).**

United States District Court, S.D. New York.

July 28, 1993.

Salomon Green & Ostrow, P.C., New York City (David M. Green, of counsel), for plaintiff.

Fulbright & Jaworski, New York City (Glen Banks, Patricia Kelly, of counsel), for defendants.

## OPINION & ORDER

EDELSTEIN, District Judge:

Plaintiff Sameer Y. Zahr ("Zahr") brings this action to enforce an alleged agreement between Zahr and defendants. Pursuant to this alleged agreement, plaintiff would receive approximately 44% of the outstanding shares of stock in Wingate Creek Acquisition Corp. ("Wingate") in exchange for his efforts on behalf of Wingate or as a result of the successful consummation of a joint venture agreement between plaintiff and Erol Y. Beker ("Beker"). Defendants move for summary judgment. For the reasons stated below, defendants' motion is granted.

## BACKGROUND

Zahr and Beker each own 44.275% of the stock of Royster, Inc. ("Royster"). Defendant Tectrade International Ltd. ("Tectrade") owns the remaining 11.45% of the stock in this entity. Royster Phosphates, Inc. ("RPI") operates a phosphate processing plant in Piney Point, Florida and is a wholly owned subsidiary of Royster. Also located in Piney Point, Florida, is the Wingate Creek Mine (the "Mine"), which produces phosphate rock of the type processed by RPI. Until mid–1990, the Mine was owned by Nu-Gulf Industries, Inc., a wholly-owned subsidiary of Gulf Atlantic Corporation ("Gulf Atlantic"). At this time, Gulf Atlantic was wholly owned by Windrose Partners, L.P. ("Windrose").

In 1990, Zahr and Beker contemplated a series of transactions to acquire the Mine in order to procure a continuous supply of phosphate for the RPI plant. To this end, Zahr and Beker discussed the possibility of having Royster or RPI acquire the Mine (the "First Proposal"). Ultimately, however, these discussions did not produce an agreement. Next, Zahr and Beker explored the possibility of creating a new, jointly held corporate entity that would acquire the Mine (the "Second Proposal").

Plaintiff and defendants dispute whether this proposed plan was consummated. In or around mid-November 1990, Beker formed Wingate. Wingate's stock was delivered to Beker and issued in his name. On November 30, 1990, Wingate acquired Gulf Atlantic from Windrose, and with it, the Mine, for $4.8 million: $3 million cash and a $1.8 million note delivered to the seller. Wingate obtained the $3 million cash necessary to acquire Gulf Atlantic from a line of credit maintained by Commodities Trading International Corporation ("CTI") with NMB Postbank Groep NV. At the time of the transaction, Zahr controlled CTI.

Plaintiff claims that these actions were contemplated by the Second Proposal. Further, plaintiff asserts that he is the owner of 44.275% of Wingate based on his oral agreement with Beker to acquire equal ownership interests in the Mine. *See Plaintiff's Rule 3(g) Statement,* at 6. Accordingly, plaintiff asserts that 44.275% of the Wingate shares issued to Beker are being held by Beker as Zahr's nominee. *See Id.* at 4. Alternatively, plaintiff claims that the purchase of the Mine was the result of an oral joint venture agreement between himself and Beker. *Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment* ("Plaintiff's Memorandum"), at 15–17. Defendant denies the existence of any agreement with Zahr and avers that Wingate was not formed as a joint venture.

## DISCUSSION

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). A party seeking summary judgment must demonstrate "that there is no genuine issue as to any material fact" such that it "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). "It is well

settled that a court should grant a motion for summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 408 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991).

The moving party has the initial burden of establishing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If the movant satisfies this prerequisite, the non-moving party may nonetheless defeat summary judgment by coming forward with specific facts that show there is a genuine issue for trial. Fed. R.Civ.P. 56(e); *see also Matushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment will be denied if the evidence bolstering the non-moving party's case is sufficient to lead a rational trier of fact to return a verdict in his favor. *National Union Fire Ins. Co. v. Walton Ins. Ltd.,* 696 F.Supp. 897, 900 (S.D.N.Y.1988).

In determining whether summary judgment is appropriate, "[i]t has long been the rule that 'on summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion.'" *Lendino v. Trans Union Credit Info. Co.,* 970 F.2d 1110, 1112 (2d Cir.1992) (quoting *Adickes,* 398 U.S. at 158–59, 90 S.Ct. at 1608–09). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight,* 804 F.2d at 11 (citations omitted). The non-movant, however,

"[i]s not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts." *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1318 (2d Cir.1990) (quoting *Lewis v. Nelson,* 277 F.2d 207 (8th Cir.1960)). Rather, once the movent has met his initial burden, "[t]o defeat a motion for summary judgment a plaintiff must offer 'concrete evidence from which a reasonable juror could return a verdict in his favor.'" *Cinema North Corp. v. Plaza at Latham Assoc.,* 867 F.2d 135, 138 (2d Cir. 1989) (quoting *Dister v. Continental Group, Inc.,* 859 F.2d 1108 (2d Cir.1988)); *see Grant Thornton v. Syracuse Sav. Bank,* 961 F.2d 1042, 1046 (2d Cir.1992).

In his complaint, plaintiff asserts five claims for relief. Each claim for relief rests upon the premise that Beker is holding Wingate stock as Zahr's nominee and that Zahr is, in fact, the equitable owner of 44.275% of Wingate's outstanding stock. If Zahr is not the equitable owner of the Wingate stock, Beker could not be holding the stock as Zahr's nominee and, therefore, there would be no material issue of fact to be resolved at trial and defendants would be entitled to summary judgment. Thus, the linchpin of the instant motion is whether, as a matter of law, Zahr may be the owner of Wingate stock.

■ Based on the aforementioned facts, Zahr could have acquired Wingate stock in two ways: through a pre-incorporation subscription agreement or through a post-incorporation agreement for the sale or transfer of securities through which Beker would be required to transfer to Zahr a portion of the Wingate stock held by Beker. Under either scenario, the pertinent agreement must be in writing in order to be enforceable. New York Business Corporation Law requires that, in order to be enforceable, a subscription agreement be in writing. *See* New York Business Corporation Law ("B.C.L.") § 503(b).[1] In addition, pursuant to section

---

**1.** Because this Court's subject matter jurisdiction rests on diversity jurisdiction, the choice of statute of frauds is governed by New York's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Cargill, Inc. v. Charles Kowsky*

*Resources, Inc.,* 949 F.2d 51, 55 (2d Cir.1991) ("A federal court must follow the conflict of laws rules prevailing in the state in which it sits."). New York utilizes an interest analysis approach to choice of law problems. *See Cargill,* 949 F.2d at 55; *William J. Conlon & Sons, Inc. v. John*

8–319(a) of the Uniform Commercial Code ("U.C.C."), as adopted by New York, any agreement between Beker and Zahr to transfer to Zahr Wingate stock held by Beker would be invalid absent a written instrument evidencing such an agreement. *See* N.Y.Stat. Art. 8, § 8–319(a) (McKinney 1992). Under U.C.C. § 8–319(a) a written agreement for the sale or transfer of securities must contain reference to the quantity and price of the securities in question. *Id.* Defendants contend, and plaintiff does not contest, that no single written instrument contains the agreement that plaintiff has alleged.

Plaintiff, however, attempts to surmount this apparent obstacle through three separate and alternative arguments. First, plaintiff contends that "he has satisfied the requirement of the two applicable statutes of frauds, New York Uniform Commercial Code § 8–319 and New York Business Corporation Law [§] 503(b), since three writings exist which were signed by Beker, which in combination memorialize the agreement between Beker and Zahr and specify all material terms of the agreement." *Plaintiff's Memorandum,* at 2. Second, plaintiff claims that "if U.C.C. § 8–319 applies and the proffered writings do not satisfy its requirements, Zahr's and Beker's agreement falls within the scope of the exception to the statute contained in U.C.C. § 8–319(b), since Zahr has paid fully for his interest in the Wingate shares." *Id.* Finally, plaintiff argues that "neither of the statutes of frauds applies, since his agreement with Beker was neither a subscription agreement nor an agreement for the sale of securities. Rather, their agreement was to acquire equal ownership in

the Wingate Mine for a fixed purchase price, to be paid in a fixed manner, for the benefit of Royster, Inc., a company owned by Beker, Zahr, and Tectrade." *Id.* at 2–3. These arguments are without merit.

## I. Plaintiff's Contention that Three Writings Satisfy U.C.C. § 8–319 and B.C.L. § 503(b)

It is beyond cavil that, to be enforceable under U.C.C. § 8–319 and B.C.L. § 503(b), a subscription agreement or an agreement to transfer securities must be in writing; oral agreements to allocate, sell or transfer securities are not enforceable. Plaintiff admits that no single written instrument contains the alleged agreement. Rather, plaintiff claims that, taken together, three distinct but allegedly connected writings contain all relevant terms of this purported agreement as required by U.C.C. § 8–319 and B.C.L. § 503(b). The three writings that plaintiff claims contain the agreement are: (1) a "Waiver and Consent," dated November 29, 1990 and signed by Erol Y. Beker, Sameer Y. Zahr, Robert L. Fellows, Vice President of NMB Postbank Groep nv, Robert Suehnhon, Vice President Berliner Kandels–Und Frankfurter Bank, Suzanne T. Durney, Vice President Chase Manhattan Bank, N.A.; (2) a "Nominee Agreement," which was executed by Erol Y. Beker in favor of Tectrade International, Ltd.; and (3) a letter (the "RPI Option"), dated November 30, 1990, from Erol Y. Beker to RPI that is signed by Beker. *See Plaintiff's Rule 3(g) Statement,* Exhibits ("Ex.") A–C. Even construing these agreements broadly and drawing all reasonable inferences in favor of plain-

---

*Wanamaker, Philadelphia,* 583 F.Supp. 212, 213 (E.D.N.Y.1984). Under New York conflicts principles, "the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 824, 248 N.E.2d 576, 581 (1969) (citations omitted); *see J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, 172 (1975); *Auten v. Auten,* 308 N.Y. 155, 161, 124 N.E.2d 99 (1954); *see also William J. Conlon & Sons,* 583 F.Supp. at 213. Only three states have an interest in this

litigation: New York, Florida, and Delaware. The parties to this action have assumed that New York State law should govern the resolution of this dispute. In addition, this Court finds that New York has the greatest interest in this case and, therefore, New York law governs resolution of the issues in this matter. It should be noted, however, that the result of the instant motion would be identical regardless of whether Florida, Delaware or New York law is applied. *Compare* B.C.L. § 503(b) *with* Del. General Corporate Law, Del.Stat. Tit. 8, § 166 *and* Fla.Ann.Stat. Corporations § 607.0620(2); *compare* N.Y.Stat. Art. 8, § 8–319(a) (McKinney 1992) *with* Del. Stat. Tit. 6, § 8–319(a) (1977) *and* Fla.Stat. § 678.319(1) (1987).

tiff, these agreements do not satisfy the applicable statutes of frauds.

■ Plaintiff correctly notes that the New York statutes of frauds may be satisfied by separate connected writings, not all of which must be signed. *See Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10–11 (2d Cir.1989); *Henry L. Fox Co. v. William Kaufman Org.*, 74 N.Y.2d 136, 140, 544 N.Y.S.2d 565, 542 N.E.2d 1082 (1989). Unsigned writings may supply terms of the contract, provided that the signed writing satisfies "two strict threshold requirements:" First, the signed writing must establish that a contractual relationship exists between the parties; second, the signed writing must "on its face refer to the same transaction" as the unsigned writings. *Horn & Hardart Co.*, 888 F.2d at 11; *see Scheck v. Francis*, 26 N.Y.2d 466, 470, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970). In analyzing whether these threshold requirements have been met, parol evidence may not be used to supplement the writings, but may be used in order to determine whether the signed and unsigned writings are "connected." *See Henry L. Fox Co.*, 74 N.Y.2d at 142–43, 544 N.Y.S.2d 565, 542 N.E.2d 1082; *Bazak Int'l Corp. v. Mast Indus. Inc.*, 73 N.Y.2d 113, 118, 538 N.Y.S.2d 503, 535 N.E.2d 633 (1979); *Scheck*, 26 N.Y.2d at 470, 311 N.Y.S.2d 841, 260 N.E.2d 493. Thus, "[u]nder New York law, '[c]ompliance with [the statutes of frauds governing securities transactions] may be found if an agreement can be pieced together out of separate writings, not all of which need be signed, provided they clearly refer to the same transaction, include all items of the contract, and at least one of them bears the signature of the party.'" *Kubin v. Miller*, 801 F.Supp. 1101, 1121 (S.D.N.Y.1992) (quoting *APS Food Sys. Inc. v. Ward Foods, Inc.*, 70 A.D.2d 483, 421 N.Y.S.2d 223, 225 (1st Dept.1979)). "All of [the terms] must be set out in the various writings presented to the court, and at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document[s] must on [their] face refer to the same transaction as that set forth in the one that was signed." *Crabtree v. Elizabeth Ar-*

*den Sales Corp.*, 305 N.Y. 48, 55–56, 110 N.E.2d 551 (1953).

■ Examining each of the documents in turn demonstrates that the proffered documents do not, taken individually or in combination, satisfy the statutes of frauds. While unsigned and signed writings may, in combination, satisfy the applicable statutes of frauds, to do so they must be "connected" writings. Connected writings are those that "clearly refer to the same transaction." *Kubin*, 801 F.Supp. at 1121. The documents that plaintiff has submitted as evidence of the alleged agreement are not connected and thus do not satisfy this threshold requirement. In addition, the proffered writings suffer from a more fundamental flaw: Drawing every reasonable inference, and construing any ambiguities, in favor of plaintiff, the submitted documents do not contain the material terms of the agreement by which plaintiff claims he is the equitable owner of 44.275% of the Wingate stock. No document submitted by plaintiff states what amount or percentage of the Wingate stock, if any, Zahr owns.

By its terms, the Waiver and Consent refers to a proposed transaction that ultimately failed rather than the transaction which occurred or an agreement by which plaintiff would be entitled to 44.275% of Wingate's stock. Paragraphs five and six of the Waiver and Consent provide that Beker and Zahr would form a corporation "wholly owned by Erol Y. Beker and Sameer Zahr" to purchase the Mine for $4.8 Million. Financing was to be provided through, *inter alia*, Chase Manhattan Bank. Thus, the Waiver and Consent contemplates an agreement that is materially different both from that alleged in plaintiff's complaint and that which actually occurred. First, plaintiff contends that he is entitled to 44.275% of Wingate's stock—a percentage different than that contemplated in the Waiver and Consent. Second, plaintiff's deposition testimony belies the contention that the Waiver and Consent relates to the transaction through which the Mine was acquired: Specifically, plaintiff testified that the proposed transaction described in this document was never consummated. *See Defendants' Reply Memorandum of Law in Further Sup-*

*port of Motion For Summary Judgment* ("Defendants' Reply Memorandum"), at 3–4 (quoting Transcript of the Deposition of Sameer Y. Zahr). Thus, this document is not "connected" to the other submitted writings, and does not evidence the agreement alleged by plaintiff, because it relates to another proposed transaction that did not occur.[2]

In addition, the Nominee Agreement does not bolster plaintiff's case because it does not evidence any agreement between plaintiff and Beker. Rather, the Nominee Agreement is between Beker and Tectrade. Furthermore, the Nominee Agreement does not refer to plaintiff or to the agreement by which plaintiff alleges that he holds an equitable interest in the Wingate stock. Finally, even assuming that the Nominee agreement is relevant, the Nominee Agreement, like the Waiver and Consent, does not specify what, if any, percentage of the Wingate stock Zahr would be entitled to. As such, the Nominee Agreement wholly fails to demonstrate a basis for plaintiff's claim to ownership of Wingate stock.

Finally, the RPI Option does not afford a basis for believing that plaintiff's oral evidence rests on a real transaction. By the RPI Option, Beker granted "RPI the right to purchase from [Beker] all of the issued and outstanding shares of capital stock of [Wingate] owned by [Beker] for an aggregate purchase price of $4,800,000.00." It is undisputed that if the option had been exercised, Zahr would have indirectly held approximately 44.275% of Wingate's stock through his ownership stake in RPI. This option was not exercised, however. Nevertheless, Zahr argues that this option, even unexercised, evidences his ownership of 44.275% of the Wingate stock. Even construing the language of the option broadly, and drawing every reasonable inference in favor of plaintiff, this Court cannot accept plaintiff's tortured construction.

## II. Plaintiff's Claim That, Even if the Signed Writings Do Not Satisfy the Statutes of Frauds, U.C.C. § 8–319(b) Estops Beker From Denying Zahr's Alleged Ownership Interest

■ Plaintiff next argues that, even if this Court finds that the above-described writings do not satisfy the statutes of frauds, the alleged transaction "would fall under the estoppel exception of U.C.C. § 8–319(b)." *Plaintiff's Memorandum*, at 13. Citing to *Heimlich v. Charlton Lithographing, Inc.*, 103 Misc.2d 741, 428 N.Y.S.2d 127 (Sup.Ct. N.Y.Co.1979), plaintiff avers that this Court should deny defendants' motion because plaintiff has "paid" for his claimed interest in the Wingate securities. In support of this contention, plaintiff states that

> Zahr "paid" for his shares within the meaning of § 8–319(b), and his performance was unequivocally referable to his agreement with Beker. Zahr procured the agreement with Windrose jointly with Beker. He authorized Royster's $3 million contribution to RPI, and RPI's repayment of $3 million to CTI. He directed CTI, which Zahr controlled, to lend $3 million to Wingate to purchase Gulf Atlantic. He negotiated jointly with Beker all supply agreements between Wingate and Royster, and Wingate and RPI, and he procured potential purchasers, at Beker's request, of all of the Wingate shares.

*Plaintiff's Memorandum*, at 14. Thus, Zahr does not allege that he gave money either to Beker or Wingate in return for his alleged 44.275% interest in Wingate, but that he took certain actions in return for the stock.

These actions are insufficient to vest Zahr with a 44.275% interest in the Wingate stock. The first purported action, that Zahr "procured the agreement with Windrose jointly with Beker" relates not to the transaction at issue here, but rather to the agreement contemplated in the Waiver and Consent—a transaction that was never consummated. Thus, this action does not constitute payment for shares in Wingate. Second, plaintiff's

---

**2.** Even assuming, *arguendo,* that this Court were to find that this document refers to the actual transaction through which the Mine was acquired, the Waiver and Consent is deficient for statute of frauds purposes because it does not

purport to represent the percentage equity interest to which plaintiff would be entitled. Because no other document which plaintiff has submitted contains this critical term, defendants would still be entitled to summary judgment.

contentions that "he authorized Royster's $3 million contribution to RPI, and RPI's repayment of $3 million to CTI" and that "he directed CTI, which Zahr controlled, to lend $3 million to Wingate to purchase Gulf Atlantic," are similarly deficient. In each case, plaintiff acted not in his individual capacity, but as an officer and director of Royster, RPI, or CTI. As such, to the extent that Zahr was responsible for these corporate actions, he was acting not in his individual capacity, but as a fiduciary of Royster or CTI. Therefore, these actions do not constitute payment by Zahr for a personal interest in the Wingate stock. If anything, these actions were undertaken for the benefit of the companies that he served and any expected benefits would redound to those companies rather than to Zahr personally. Third, plaintiff's contention that he participated in the negotiation of supply agreements between Royster, RPI and Wingate while he served as an officer and director of Royster and RPI, simply demonstrates that plaintiff served the companies that he directed by obtaining supply agreements—these actions were clearly not designed to "pay" for shares in Wingate.

Thus, Zahr's claim that he paid for the Wingate shares within the meaning of U.C.C. § 8–319(b) must fail. Plaintiff has not presented any credible evidence that he took actions in his individual capacity that this Court should deem payment for Wingate shares. What Zahr has shown is that, as an officer and director of certain corporate entities, he negotiated with Beker. This is insufficient as a matter of law to support Zahr's claim to eligibility for treatment under U.C.C. § 8–319(b).

### III. Plaintiff's Contention that the Alleged Agreement Created A Joint Venture that is Not Subject to the Statute of Frauds

■ Plaintiff's final argument, that the purported oral agreement between Beker and Zahr was in fact a joint venture agreement that is not subject to applicable statutes of fraud, is without merit. Plaintiff claims that Beker and Zahr agreed jointly to form and own Wingate as a vehicle to acquire the Mine. Plaintiff then notes that joint venture agreements are contractual in nature, and that they need not comply with the statute of frauds if they can be performed within one year. Plaintiff reasons that the incorporation of Wingate and the issuance of shares was merely incidental to completion of the joint venture's goals. As such, Zahr's claim to 44.275% of the Wingate shares is not blocked by the fact that this purported agreement is not in writing. As summarized by plaintiff:

> The agreement between Beker and Zahr created a joint venture.... The actual acquisition of the Wingate shares was collateral to the essential terms of the joint venture, and took place only to effectuate the purpose of the joint venture.... By choosing Wingate as the formal vehicle by which to acquire the Gulf Atlantic shares, and thus control over the Wingate Creek mine, they did not change the joint venture agreement.

*Plaintiff's Memorandum*, at 16.

While it is undisputed that Wingate was incorporated, issued shares, and operated under the laws governing corporations, it was not, plaintiff claims, a corporation but rather a partnership that resulted from a joint venture. Boiled down to its essentials, then, plaintiff's argument evinces a misunderstanding of the laws governing corporations and partnerships.

It is axiomatic that individuals may not, as a matter of law, operate a business entity as a partnership for the purposes of defining their rights vis-a-vis each other while concurrently holding the entity out to the general public as a corporation. As the New York Court of Appeals has stated, "[t]he two forms of business are mutually exclusive, each governed by a separate body of law. When parties 'adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders. They cannot be partners *inter sese* and a corporation as to the rest of the world.'" *Weisman v. Awnair Corp. of Am.*, 3 N.Y.2d 444, 448–49, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957) (quoting *Jackson v. Hooper*, 76 N.J.Eq. 592, 598–99, 75 A. 568 (Ct.Err. &

App.1910)); *see Olivetti Partners C.V. v. O'Dowd*, 142 A.D.2d 527, 530 N.Y.S.2d 153, 154 (1st Dep't 1988) ("a joint venture cannot be carried on by individuals in a corporate form"); *see also Yonofsky v. Wernick*, 362 F.Supp. 1005, 1021 (S.D.N.Y.1973) ("Under New York substantive law a joint venture may not be carried on by individuals through a corporate form."). Thus, a business entity is either a corporation or a partnership: Legally, it cannot be some hybrid—governed by different laws depending on who, a "partner" or the public, is suing it. It is undisputed that Wingate is a corporation. Under New York law, Wingate is not, therefore, a joint venture/partnership. As such, plaintiff's contention that Wingate, cloaked by the shield of incorporation, is truly a partnership that was created as a result of a joint venture, is wholly without merit.

Indeed, even accepting plaintiff's argument, and assuming that a business entity could be operated as a partnership *inter sese* and as a corporation as to the rest of the world, this Court would still grant defendants summary judgment. Plaintiff has failed to offer credible evidence that the parties entered into a joint venture. Just like the "dog that did not bark" of Sherlock Holmes lore, the fact that plaintiff has offered absolutely no evidence that a joint venture was contemplated let alone consummated is, in light of defendants' showing, compelling proof that no such agreement existed. At the very least, plaintiff has failed to raise a genuine issue of material fact regarding the joint venture claim. To hold otherwise would be to give plaintiff the benefit of an unreasonable and unfounded inference.

## CONCLUSION

Defendants have established the absence of a genuine issue of material fact. Plaintiff has failed to rebut defendants' showing by coming forward with specific facts that demonstrate that there is a genuine issue for trial. Accordingly, defendants are entitled to judgment as a matter of law, and defendants' motion for summary judgment is GRANTED. Plaintiff's complaint is dismissed and the Clerk of the Court is directed to remove this case from the Court's docket.

SO ORDERED.