69 F.3d 669
 33 Fed.R.Serv.3d 923, 104 Ed. Law Rep. 584
 Ray GANT, Jr., Ray Gant, Sr. and Elisa Gant, Plaintiffs-Appellants,
v.
WALLINGFORD BOARD OF EDUCATION, Barbara Beecher, Richard
Centner, Phyllis Dechello, Mark Moynihan, T. Thomas Murphy,
Valerie Nolan, Steve Pickering, John Wooding, Suzanne
Wright, George Bozzi, Jr., Donna Lange, Vincent Testa, Dr.
Joseph Cirasuolo, Patricia Cronin and Grace Candido,
Defendants-Appellees.
 No. 1765, Docket No. 95-7015.
 United States Court of Appeals,
 Second Circuit.
Argued June 27, 1995.
Decided Oct. 26, 1995.
 
 W. Martyn Philpot, Jr., New Haven, CT, for Plaintiffs-Appellants.
 Peter A. Janus, Hartford, CT (Siegel, O'Connor, Schiff & Zangari, of counsel), for Defendants-Appellees.
 Before VAN GRAAFEILAND, JACOBS and CABRANES, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 The complaint in this civil rights action alleges that defendants-appellees the Wallingford Board of Education and various employees of the Wallingford School District discriminated against first-grade student Ray Gant, Jr., by demoting him to kindergarten solely by reason of his race. Plaintiffs-appellants Ray Gant, Jr. and his parents Ray Gant, Sr. and Elisa Gant appeal from an order of the United States District Court for the District of Connecticut (Covello, J.) dismissing their complaint in its entirety pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted.[1] The dismissal rested on two grounds: first, that the pleading set forth no more than conclusory assertions of racial discrimination and, second, that plaintiffs were deemed to have adopted certain exculpatory statements in a document prepared by the School Superintendent and annexed to the complaint as an exhibit.
 
 
 2
 Because we believe that under a fair reading the complaint does plead discrimination based upon race, we vacate the order of the district court and remand for further proceedings.
 
 BACKGROUND
 
 3
 When reviewing a district court's dismissal of a complaint for failure to state a claim, we must assume--strictly for the purposes of appeal--that the facts alleged in the complaint are true. Hartford Fire Insur. Co. v. California, --- U.S. ----, ----, 113 S.Ct. 2891, 2895, 125 L.Ed.2d 612 (1993). At this stage of the litigation, we express no view as to whether the plaintiffs have actually proved those allegations.
 
 
 4
 According to the complaint, the Gant family moved from Meriden, Connecticut to Wallingford, Connecticut during the winter of 1993 and enrolled six-year-old Ray, Jr. in the first grade of Cook Hill Elementary School, a public school in Wallingford. Ray, Jr. was the only African-American student in the class. The complaint alleges that "he was subjected to unprovoked and repeated racial slurs, continued taunting and unmitigated harassment by fellow students, as well as by certain parents of students enrolled in Cook Hill...." The complaint alleges that school officials, who were at all times acting under color of state law, knew of these acts but took no step to prevent recurrences:
 
 
 5
 At no time did the defendant Board or any of its individual members, through its officials, servants, agents and/or employees ... ever act to either correct, prevent, stop, warn or reprimand those individuals responsible for said racially biased acts against the plaintiff, despite the fact that the aforedescribed deplorable and discriminatory acts were immediately brought to their specific attention.
 
 
 6
 Within three days of Ray, Jr.'s arrival, his first grade teacher, defendant-appellee Grace Candido, informed Elisa Gant "that her son could not do the work necessary for successful completion of first grade and, therefore, should immediately be transferred back into kindergarten...." The decision to demote Ray, Jr. was authorized by defendant-appellee Patricia Cronin, the school's principal. The complaint alleges that this step was taken without informing the Gants of the school's written policy not to demote a student without parental approval:
 
 
 7
 Without fully explaining the retention policy of the Wallingford Public Schools which required consultation with and approval by the plaintiff's parents, and without the benefit of any testing whatsoever and without explaining any of the other academic alternatives available to the Gants, the principal of Cook Hill, Mrs. Patricia Cronin, who is white or otherwise of non-African American ancestry, authorized the transfer of the plaintiff, Ray, Jr., back to kindergarten.
 
 
 8
 This language does not foreclose the possibility that there was in fact parental consent; thus, in a studious way, plaintiffs' lawyer seems to avoid commitment on an issue that is potentially significant.
 
 
 9
 Strictly for the purposes of reviewing the district court's dismissal, we must accept the allegation of the complaint that the decision to demote Ray, Jr. was not based on the child's level of performance and that Ray, Jr. "had the same or similar skill levels" as other students in the first grade. The complaint further alleges that the decision to demote Ray, Jr. was based on racial grounds:
 
 
 10
 Instead of directly confronting the racially hostile environment which clearly then and there existed at Cook Hill towards the plaintiff, school officials improperly chose to remove the "problem" and/or "blame the victim", thereby illegally, willfully, intentionally and with reckless disregard of his rights, transfer the plaintiff out of his first grade class back to kindergarten.
 
 
 11
 These acts and omissions allegedly served to deny "the plaintiff an equal opportunity to participate in the educational activities, programs and courses of study offered to all other students within the first grade." Ray, Jr. is said to have been harmed in a variety of physical and psychological ways. His parents claim to have suffered compensable "anxiety, stress and apprehension concerning their son's physical and psychological well-being...."
 
 
 12
 Two exhibits are attached to the complaint: a copy of the Wallingford Public School retention policy (Exhibit A), and a copy of an investigatory report concerning the Gants' assertions of racial discrimination that was prepared by School Superintendent Joseph Cirasuolo for the Wallingford Board of Education (Exhibit B). Superintendent Cirasuolo's Report (the "Superintendent's Report") explains the steps he took to investigate the Gants' claim, describes the racial incidents and the measures taken by the school, and reaches certain conclusions about what happened and how school personnel performed. The Superintendent's Report describes the following racially-charged incidents:
 
 
 13
 School personnel are aware of three (3) instances where Ray was subjected to racial insults.
 
 
 14
 The first incident occurred while Ray was still in Mrs. Candido's class. On a day when Mrs. Candido was absent, the substitute teacher heard another student refer to Ray as a "chocolate drop." When Mrs. Candido received this information, she chose to delay action because it was her judgment that reacting to one incident that had been reported to her by a substitute teacher could serve to develop a climate of hostility rather than to remove one. Mrs. Candido never observed herself any instances when Ray was subjected to racial insults and no other instances were ever reported to her.
 
 
 15
 A second incident occurred while Ray was in Mrs. Roman's [sic] kindergarten class. This incident was resolved to everyone's satisfaction including the Gants. Mrs. Romans neither observed nor had reported to her any other such incidents.
 
 
 16
 A third incident occurred at a bus stop when a parent of another student referred to Ray as a "nigger." A short time later, the other student used the same term in reference to Ray. The bus driver reported the matter to Mrs. Cronin. The parent involved is a person who has no telephone and who on past occasions has displayed in nonracial ways the same ignorance, intolerance, and belligerency that she displayed during the incident in question. As a result, Mrs. Cronin decided to postpone any attempt to persuade this particular parent that her actions were entirely inappropriate. Mrs. Cronin did ask the bus driver to monitor the situation closely and to report any further incidents.
 
 
 17
 The bus driver did not observe any further instances that involved racial insults. There were occasions, however, when Ray and other students on the bus did mutually exchange hostile words. This was reported by the driver to Mrs. Cronin and she responded by making it clear to all involved that this behavior would not be tolerated and by separating the bus seats of Ray and the one other student with whom Ray appeared to be having the greatest degree of conflict.
 
 
 18
 After recounting these incidents, Superintendent Cirasuolo concluded that "[t]here is no persuasive evidence that supports the allegation that Ray was subjected to constant abuse of a racial nature at Cook Hill." As to the school's handling of these incidents and Ray, Jr.'s demotion, Superintendent Cirasuolo concluded that "[a]ll available evidence indicates that Ray's transfer to a kindergarten class was appropriate," and that "[t]here is no persuasive evidence to support any criticism of how any staff member at Cook Hill addressed this situation."
 
 
 19
 The Gants filed their complaint on August 17, 1994. Defendants moved to dismiss the complaint on numerous grounds on September 28, 1994. The district court granted defendants' motion on November 30, 1994 and entered judgment on December 2, 1994. In doing so, the district court relied heavily upon the Superintendent's Report. The full text of the district court's opinion is as follows:
 
 
 20
 The defendants' motion to dismiss is granted. "It is well-settled in this Circuit that a complaint, consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Fed.R.Civ.P., Rule 12(b)(6)." Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir[.] 1978). In this case the complaint itself sets forth only "naked assertions" of racial discrimination. The plaintiffs have appended as an exhibit to their complaint, and thus, under Fed.R.Civ.P., Rule 10(c), incorporated by reference into their complaint, the findings of the investigation of this matter conducted by Superintendent Cirasuolo, concluding that no actions of any school official were motivated by considerations of race. Taken in its entirety, the complaint thus sets forth facts which fail even to suggest racial discrimination. Accordingly, the plaintiffs have failed to allege violations of the Civil Rights Acts and their complaint must be dismissed. It is SO ORDERED.
 
 
 21
 The Gants filed a motion for reconsideration on December 12, 1994. On January 30, 1995, the district court granted the motion for reconsideration but denied substantive relief. The Gants did not seek to amend their complaint. This appeal followed.
 
 DISCUSSION
 
 22
 A district court's grant of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is reviewed de novo on appeal. Grimes v. Ohio Edison Co., 992 F.2d 455, 456 (2d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993). "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in plaintiff's favor." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). The complaint may be dismissed only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). The issue is not whether a plaintiff is likely to prevail ultimately, "but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." Weisman v. LeLandais, 532 F.2d 308, 311 (2d Cir.1976) (per curiam) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). "This standard is applied with even greater force where the plaintiff alleges civil rights violations...." Hernandez, 18 F.3d at 136.
 
 
 23
 The complaint seeks recovery under 42 U.S.C. Secs. 1981, 1983, 1985(3) and 1986. The district court, which dismissed the complaint for failure to plead discrimination, did not consider which of the civil rights statutes might furnish a remedy. We proceed on the assumption that a civil rights violation could be made out under one or more of these civil rights statutes if the complaint contains a sufficient allegation of discrimination.[2] In essence, plaintiffs allege that the Wallingford school officials, acting under color of state law, conspired to deprive Ray, Jr. of equal access to education because he is an African-American. In order to survive a motion to dismiss under any of the civil rights statutes invoked, "the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir.1994). On appeal, defendants argue that plaintiffs have failed to meet this standard because the complaint alleges no more than that Ray, Jr. is African-American and that defendants and others associated with the school are not.
 
 
 24
 A. "Naked Assertions". In dismissing plaintiffs' complaint, the district court relied on the following passage from Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir.1978) (per curiam): "It is well settled in this Circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6)." We conclude that, under this standard, the complaint survives scrutiny under Rule 12(b)(6).
 
 
 25
 The complaint in Martin "stated only that the defendants had discriminated against [Martin] on the basis of race between August 1974 and June 1975 by denying him the authority, salary, and privileges commensurate with his position." Id. at 372 (emphasis added). The Gants' complaint states or can be read to claim that Ray, Jr. "had the same or similar skill levels" as other students in his class, yet was transferred to a lower grade in an effort to allay the racial tension caused by the child's presence, and that this was done without parental consultation and consent notwithstanding a school policy requiring parental consultation and consent for demotion. At this preliminary stage of proceedings, all one can say is that, if these plaintiffs have capacity and standing to assert these allegations and have the ability to prove them under a statute that grants relief, they will have established liability against a defendant unable to interpose a sufficient defense. But that is enough to defeat the characterization of this discrimination claim as mere "naked allegations."B. Fed.R.Civ.P. 10(c). Another stated reason for the district court's dismissal of this claim is that "plaintiffs have appended as an exhibit to their complaint" the Superintendent's Report, and that by so doing the plaintiffs necessarily incorporated the report into their complaint in such a manner as to accept all statements in it as true, including the exculpatory conclusions. As the district court thus read the complaint, the Gants affirmatively pleaded and adopted the following conclusions of the Superintendent's Report, thereby contradicting and defeating their own claim:
 
 
 26
 There is no persuasive evidence that supports the allegation that Ray was subjected to constant abuse of a racial nature at Cook Hill. No pattern of this type was observed by school staff nor was any reported during the school year. Ray's reluctance to attend school, which reluctance has been attributed to his being taunted on a regular basis, appear[s] to have disappeared as soon as he was transferred to kindergarten.
 
 
 27
 . . . . .
 
 
 28
 All available evidence indicates that Ray's transfer to a kindergarten class was appropriate.
 
 
 29
 . . . . .
 
 
 30
 There is no persuasive evidence to support any criticism of how any staff member at Cook Hill addressed [the racial] situation.
 
 
 31
 The Superintendent's Report also states that Ray, Jr. was struggling academically while in the first grade both in the Meriden school system and in Wallingford, which contradicts the express allegation of the complaint that Ray, Jr. "had the same or similar skill levels" as the other first graders. Clearly, if these conclusions and statements are deemed to be part of the complaint, the Gants would be unable to sustain their lawsuit. We conclude, however, that the district court misapplied Fed.R.Civ.P. 10(c). Rule 10(c) states:
 
 
 32
 (c) Adoption by Reference; Exhibits. Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.
 
 
 33
 Thus, "[a]lthough a court considering a motion to dismiss for failure to state a claim is limited to the facts stated in the complaint, the complaint includes any written instrument attached to it as an exhibit and any statements or documents incorporated into it by reference." Paulemon v. Tobin, 30 F.3d 307, 308-309 (2d Cir.1994); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).
 
 
 34
 Both the district court and the defendants assume that Rule 10(c) requires a plaintiff to adopt as true the full contents of any document attached to a complaint or adopted by reference. This is not a proper reading of the rule. Courts have found that, "[i]f the appended document ... reveals facts which foreclose recovery as a matter of law, dismissal is appropriate," Associated Builders, Inc. v. Alabama Power Co., 505 F.2d 97, 100 (5th Cir.1974) (prospectus attached to complaint alleging bond purchase based on material misrepresentations). An appended document will be read to evidence what it incontestably shows once one assumes that it is what the complaint says it is (or, in the absence of a descriptive allegation, that it is what it appears to be). For example, a written contract appended to the complaint will defeat invocation of the Statute of Frauds, and a document that discloses what the complaint alleges it concealed will defeat the allegation of concealment. By the same token, however, a libel plaintiff may attach the writing alleged in the complaint to be libelous without risk that the court will deem true all libels in it. Similarly, a receipt for goods, alleged in the pleading to have been forged, may or may not evidence forgery on its face, but it does not concede delivery of goods for pleading purposes.
 
 
 35
 The Superintendent's Report is referenced as follows in the complaint: "The defendant, Dr. Joseph Cirasuolo in his administrative capacity adopted, approved and/or ratified the actions and/or omissions of the defendants, Grace Candido and Patricia Cronin. (Refer to Exhibit B attached.)" What is the import of attaching Exhibit B? Although attached to show Cirasuolo's adoption, approval or ratification of wrongdoing, it does not (in itself) do so, if only because it concludes that no wrong was done. Under Rule 10(c), if we assume that the document is what it is alleged and purports to be, it would effectively refute any (hypothetical) allegation that Cirasuolo prepared no report, or prepared one that admitted wrongdoing on behalf of the school district. But Exhibit B does not bear the weight placed on it by the district court: it does not establish, simply by being what it is, that the school personnel acted properly. Given the allegations of the complaint that we must accept as true, the Gants have invited us to read Exhibit B as a self-serving document rather than a particularization of their claim. It was therefore error for the district court to assume that plaintiffs' complaint adopted the Superintendent's exculpatory conclusions. Cf. Rose v. Bartle, 871 F.2d 331, 340 n. 3 (3d Cir.1989) (discussing the inapplicability of Rule 10(c) to affidavits).
 
 
 36
 C. Discretionary Powers. Relying on Johnpoll v. Elias, 513 F.Supp. 430 (E.D.N.Y.1980), defendants contend on appeal that issues of student placement are left solely to the discretion of school officials, and that nothing in the Constitution grants anyone an "interest in the transfer of a student from first grade to kindergarten." The complaint in Johnpoll alleged that the student's due process rights were violated by placement in an inferior school that would stunt his emotional development. Acting on the student's behalf, his father brought suit seeking a preliminary injunction directing the New York City Board of Education to transfer the boy to a school of the student's choosing.
 
 
 37
 The Johnpoll court acknowledged that "once a state like New York chooses to provide public education, ... the right to an education 'must be made available to all on equal terms,' ... and this property interest cannot be denied without certain minimum procedures required by the Due Process Clause." Id. at 431 (quoting Brown v. Board of Education 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1953)). However, the Johnpoll complaint did not allege that the placement decision was made on unequal or impermissible terms, or without due process of law. In rejecting the claim, the Johnpoll court found that the case did not
 
 
 38
 present a situation [in which plaintiff has] ... been denied his right to education. He can receive an education at [the school selected by the Board of Education]. Merely because Joseph is not being permitted to attend the school of his choice is not tantamount to a denial of a right to an education.... With all due respect to the plaintiff's parental concern, this court cannot be used as a vehicle to review fundamental administrative decisions such as student placement.
 
 
 39
 513 F.Supp. at 431-32. We have no occasion to endorse or reject the reasoning of Johnpoll, because that case is easily distinguishable from the appeal before us, in which the complaint essentially pleads an equal protection claim based on a short and direct chain of causation between Ray, Jr.'s race and his pedagogically unjustified demotion.
 
 
 40
 Although few adults will be able to recall the curriculum at each level of primary education, kindergarten differs substantially from first grade. For one thing, as confirmed at oral argument and in the briefs, kindergarten meets for only part of the school day. In the absence of a record on this subject, we have no difficulty accepting the idea that a student who has mastered kindergarten will learn less by repeating it than by being promoted to the next grade. Demotion, even at this rudimentary stage of education, may permanently delay the student's ultimate academic goals. We reject defendants' suggestion that a school's decision to make such a transfer based on a student's race (as alleged here) is unreviewable by the federal courts.
 
 CONCLUSION
 
 41
 The district court's judgment is vacated and the case remanded for further proceedings. We offer no opinion as to the merits of defendants' numerous alternative arguments for dismissal of the complaint raised in their original motion to dismiss and not yet considered by the district court.
 
 
 42
 VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:
 
 
 43
 In recent weeks, there have been nation-wide lamentations over what was deemed to be a resurgence of racial animosity. There are numerous reasons for this unfortunate animosity, one of which is the bringing of baseless lawsuits alleging constitutional discrimination. I am convinced that this is such a lawsuit. Accordingly, although I concur with my colleagues that the Rule 12(b)(6) dismissal of the infant's claims cannot stand, I would be derelict in my duty to both the parties and our busy district courts if I did not express the reluctance with which I do so.
 
 The Name-Calling
 
 44
 At the outset, I cannot emphasize too much that we are dealing here with six-year-old children who, despite their tender years, have the same First Amendment rights as do adults. Indeed, because of the infants' immaturity, the test of "fighting words" (words that by their very utterance tend to incite immediate violence or breach of the peace, see NAACP v. Claiborne Hardware Co., 458 U.S. 886, 927, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982); Gooding v. Wilson, 405 U.S. 518, 523, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972)) should be more generously applied to them than would be the case with mature adults. Children do not think or behave like adults. Generations of them have recited the doggerel "Sticks and stones may break my bones, but names will never hurt me." I would hold, therefore, that when one six-year-old child calls another "chocolate drop" or "nigger," and no violence or breach of the peace results, the infant, knowingly or not, is exercising his right of free speech and is not guilty of actionable wrongdoing. "The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). A teacher may attempt to acquaint her youthful charges with some of the social graces; however, the Constitution does not compel her to do so. Instead, it limits the teacher's activities to those which do not violate specific constitutional guarantees. See Wood v. Strickland, 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975). As District Judge Gare nicely put it in Stanton v. Brunswick School Dep't, 577 F.Supp. 1560, 1575 (D.Me.1984):
 
 
 45
 The public interest may be thought to be best served if schools and teachers practice the historical orthodoxies of our political freedom while they preach the temporally transitory orthodoxies of "taste." They may legitimately, and should, seek to inculcate the latter, but they may not, in the effort to do so, transgress upon the former. In the final analysis, under our Constitution, individual liberty of expression must be accorded its day even at the expense of the promotion of aesthetic sophistication.
 
 
 46
 We are not concerned here with an ordinance or regulation which arguably may be so construed as to eliminate First Amendment protection because of improper reference to race or religion. Our colleges have learned to their dismay how difficult it is to craft rules and regulations that allow of only one construction. See, e.g., U.W.M. Post, Inc. v. Board of Regents of the Univ. of Wisc. Sys., 774 F.Supp. 1163 (E.D.Wisc.1991). Thus, the word "nigger" may or may not be constitutionally offensive depending on the context in which it is used. Cf. id. at 1180. So far as incidents even remotely subject to school control are concerned, the issue here involves the spontaneous utterances of children, who are too immature to understand the real meaning of racial prejudice. As in the field of tortious speech, an infant must appreciate the offensiveness or wrongfulness of his words before he can be held liable therefor. See, e.g., 2 Harper, James & Gray, The Law of Torts Sec. 8.13 at 590 (2 ed.1986); Cleveland Park Club v. Perry, 165 A.2d 485, 487 (D.C.1960); Horton v. Reaves, 186 Colo. 149, 155, 526 P.2d 304 (1974). If, as appellants suggest, the school were to punish these youngsters for their protected speech, it might well be shifting liability exposure from one constitutional offense to another, and at the same time be creating a greater barrier to improved race relations than might result from simple name-calling.The Transfer to Kindergarten
 
 
 47
 Although I concur with the majority's Rule 12(b)(6) conclusion, I am skeptical of appellants' claim that it was appellees' racial prejudice against the infant Ray Gant, Jr. that motivated his transfer to kindergarten. My skepticism is based upon both the inherent unlikelihood that such vindictive motivation against a six-year-old child existed and also upon the asserted facts, not the "exculpatory conclusions," contained in Exhibit B attached to the complaint. In paragraph 19 of the complaint, plaintiffs alleged that Board Superintendent Joseph Cirasuolo "adopted, approved and/or ratified the actions and/or omissions of the [defendant teachers]," and concluded these allegations with the words "Refer to Exhibit B attached." If the contents of Exhibit B were not intended to support the allegation of adoption, approval, etc., it is difficult to understand why they were referred to. "In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference...." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991); see also Paulemon v. Tobin, 30 F.3d 307, 309 (2d Cir.1994); Hertz v. City of New York, 1 F.3d 121, 125 (2d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1993). I do not suggest that the contents of Exhibit B, standing alone, warrant affirmance of the district court's Rule 12(b)(6) order. I do suggest, however, that the contents were incorporated in the complaint and therefore may properly be considered in both the district court and this Court.
 
 
 48
 The Superintendent's report, with all conclusory statements deleted, reads as follows:
 
 Investigative Steps
 
 49
 I took the following steps in my investigation of this matter.
 
 
 50
 1. I consulted with the following staff members:
 
 
 51
 a. Mrs. Cronin, Cook Hill's principal,
 
 
 52
 b. Mrs. Candido, the student's first grade teacher,
 
 
 53
 c. Mrs. Romans, the student's kindergarten teacher,
 
 
 54
 d. Mrs. Mason, the school psychologist who is assigned to Cook Hill.
 
 
 55
 2. I reviewed the following records that pertain to the student:
 
 
 56
 a. His final report card from the Casimir Pulaski Elementary School in Meriden.
 
 
 57
 b. The report of the Planning and Placement Team (PPT) meeting that was held at Cook Hill with respect to the student on 5/28/93.
 
 
 58
 3. I held a joint meeting with the student's parents, Mrs. Cronin, and Mrs. Romans. The parents were accompanied by a family member, two (2) representatives of the Meriden-Wallingford Branch of the NAACP, an advocate, and a former Wallingford Public Schools' student who had attended Cook Hill. Of her own volition, Mrs. Candido did not attend this meeting which took place on 8/23/93. Because the meeting took place during Mrs. Candido's vacation time, she could not be compelled to attend the meeting.
 
 
 59
 4. I scheduled a joint meeting with the parents, Mrs. Cronin, and Mrs. Candido for 8/31/93. On 8/30/93, the parents informed my office that they were not willing to attend the meeting. I asked the parents to reconsider this decision not to attend such a meeting and, to date, I have received no reply to my request.
 
 The Student's Grade Placement
 
 60
 The student was registered at Cook Hill on 2/23/93. He transferred from Casimir Pulaski in Meriden, Connecticut.
 
 
 61
 The last report card issued by Casimir Pulaski to the student's parents indicated that he was having serious difficulty learning to read and that he was experiencing some behavioral difficulties as well. The report card indicated that a Child Study Team meeting had been scheduled on 2/1/93 regarding the student. Within two (2) weeks of this date, the student and his parents moved to Wallingford.The student's first day at Cook Hill was 2/24/93. It was almost immediately apparent to his teacher, Mrs. Candido, that he was having serious difficulty with reading instruction. His inability to do the work quickly transformed into an unwillingness to attempt any reading work despite special efforts made by the teacher to assist him. He would not even open a reading book and his frustration caused him to cry when reading time occurred.
 
 
 62
 At the end of his first week in school the student refused to take the school bus and had to be brought to school by his mother. On that morning, his mother had to pry his fingers from the car door handle to get him into the school building. Given her son's actions, the student's mother remained in her son's classroom for most of the morning.
 
 
 63
 Mrs. Candido conferred with the mother before she left school on that day. During the conference, Mrs. Candido described briefly the problems that the student was experiencing, indicated that it appeared that the student would not be prepared to enter second grade in September 1993, and said that she would discuss with Mrs. Cronin an alternate grade placement for 1992-93. While she did not specify for Mrs. Gant an alternate grade placement, Mrs. Candido had a transfer to a transitional class in mind. It was that recommendation that Mrs. Candido made to Mrs. Cronin.
 
 
 64
 Mrs. Cronin took that recommendation under consideration and reached the conclusion that while a transfer for Ray out of first grade was appropriate, placing him in a transitional class would not be wise because even the transitional class was beyond Ray's reading achievement level in 3/93. She, therefore, decided that a placement in Mrs. Roman's kindergarten class would be most appropriate for Ray.
 
 
 65
 Mrs. Cronin reached this conclusion without requesting any testing for Ray because his difficulties with first grade reading were very apparent and because those difficulties were causing Ray to attend school with great reluctance.
 
 
 66
 Mrs. Cronin met with Mrs. Gant to present her with the recommendation that Ray be transferred to kindergarten. Mrs. Cronin ended that meeting convinced that Mrs. Gant had approved the transfer. Mrs. Gant indicated to me at the meeting mentioned above that she did not agree with the transfer but that she may have appeared to approve it because she felt that she had no choice. Mrs. Gant apparently did not know that the school system makes it a practice to make transfers of this type only with parental approval.
 
 
 67
 On 3/10/93, eleven (11) days after he entered Cook Hill, Ray was transferred to kindergarten. On his first day in his new grade, he was reluctant to attend school. From 3/11/93 to the end of the school year, however, he attended willingly....
 
 
 68
 On 9/2/93, Ray's parents requested and were granted an out-of-district placement at Parker Farms Elementary School. He was placed in first grade with parental approval. When Mr. Gant met with me to present his out-of-district placement request, we discussed Ray's grade placement at Parker Farms School and I told him that from everything I knew about Ray, it was my opinion both as an educator and as a parent that first grade was the appropriate placement....
 
 
 69
 Related to the matter of grade placement is the issue of testing. In a letter to me dated 5/10/93, the Gants requested testing for Ray to determine whether he had a handicapping condition. I referred the letter to Dr. Bivona, the director of Public Personnel Services and a PPT was held on 5/21/93 regarding the request. At the conclusion of that PPT, the Gants refused permission for Ray to be tested.
 
 
 70
 In late 6/93, Mrs. Cronin met with the Gants at their request to discuss the circumstances that led to Ray's transferal to kindergarten. During that meeting, the issue of testing was raised once again and the Gants indicated that they were willing to approve testing for Ray. Mrs. Cronin asked the Gants to sign the appropriate approval forms and asked Mrs. Mason the school psychologist who is assigned to Cook Hill to place Ray on her schedule early in September 1993. To date, the Gants have not returned signed approval forms.
 
 
 71
 Appellants have given us no reason to believe that the facts as above stated are not substantially true. For example, when one reads the allegation in the complaint that the infant plaintiff had the "same or similar skill levels" as the other students enrolled in his first grade class, one cannot help but wonder whether this allegation has any foundation in fact. Making allowance for normal parental exaggeration, one may perhaps accept the senior Gants' appraisal of their son's skill levels. However, the same is not true of his classmates for ten days, whose skills obviously were unknown to either the Gants or their lawyer. Under the circumstances, the certification of plaintiffs' signatory attorney that, to the best of his knowledge, information and belief formed after reasonable inquiry, the above allegation has evidentiary support, is at best a questionable practice. See, e.g., Levine v. F.D.I.C., 2 F.3d 476, 479 (2d Cir.1993) (upholding imposition of sanctions for Fed.R.Civ.P. 11(b)(3) violation). My colleagues' comment that "in a studious way, plaintiffs' lawyer seems to avoid commitment on an issue that is potentially significant," supra, at 671, is an understatement when considered against the attorney's obligation as an officer of the court.
 
 
 72
 In Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968), the Court made the following oft-quoted statement:
 
 
 73
 By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.
 
 
 74
 Despite the "studious" efforts of Gant's attorney to depict a violation of the infant plaintiff's basic constitutional rights, I am satisfied that there was no such violation. I regret that appellees must be subjected to the emotional and financial trauma of defending against a lawsuit with punitive damage exposure that I am convinced is without merit.
 
 The Parents' Claim
 
 75
 Although I concur in the majority's opinion with respect to the infant Gant, unlike my colleagues, I would resolve the issue of the parents' claims, which are predicated on the wrong allegedly inflicted on their son. It is well-settled law that a civil rights suit is a personal suit and one may not recover damages for the violation of another person's constitutional rights, even though that person may be a close relative such as a child. See, e.g., Barrett v. United States, 622 F.Supp. 574, 591 (S.D.N.Y.1985), aff'd on other grounds, 798 F.2d 565 (2d Cir.1986); Fobbs v. Holy Cross Health Sys. Corp., 29 F.3d 1439, 1447-48 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995); Javits v. Stevens, 382 F.Supp. 131, 135 (S.D.N.Y.1974); Coon v. Ledbetter, 780 F.2d 1158, 1160-61 (5th Cir.1986); Dohaish v. Tooley, 670 F.2d 934, 936 (10th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); O'Malley v. Brierley, 477 F.2d 785, 789 (3d Cir.1973); Broadnax v. Webb, 892 F.Supp. 188, 190 (E.D.Mich.1995). Accordingly, whatever disposition is made of the claim of Ray Gant, Jr., the claim of his parents to recover for their alleged anxiety and emotional stress cannot stand. I would affirm the dismissal of the parents' claim.
 
 
 
 [1]
 The district court dismissed plaintiffs' claims under the civil rights laws pursuant to Rule 12(b)(6). Plaintiffs' state law claims were premised on pendent jurisdiction
 
 
 [2]
 Defendants moved to dismiss on a number of alternative grounds. The district court did not address these alternative grounds, and we offer no opinion concerning their merits. We note, however, that (a) Ray Gant, Jr. obviously lacks capacity to sue; (b) his parents do not plead that they are suing on his behalf or as his next friend; and (c) the parents' claim is subject to scrutiny on the grounds identified in the dissent. On remand, jurisdiction should be addressed promptly and, if necessary and possible, repaired